NORTHERN LIGHTS SHOPPING CENTER, INC., Respondent-Appellant, *v.* STATE OF NEW YORK, Appellant-Respondent. (Claim No. 34798.)

NORTHERN LIGHTS SHOPPING CENTER, INC., Respondent-Appellant, *v.* STATE OF NEW YORK, Appellant-Respondent. (Claim No. 36697.)

NORTH STAR REALTY CORPORATION, Respondent-Appellant, *v.* STATE OF NEW YORK, Appellant-Respondent. (Claim No. 36695.)

Fourth Department, February 27, 1964.

*Louis J. Lefkowitz, Attorney-General* (*Julius L. Sackman* and *Paxton Blair* of counsel), for appellant-respondent.

*Driscoll, Mathews, Gingold & Cass* (*Daniel F. Mathews, Sr., Francis D. McCurn* and *John F. Lawton* of counsel), for respondents-appellants.

GOLDMAN, J. The State appeals in these condemnation proceedings from three judgments of the Court of Claims principally on the ground that any damage sustained by claimants as a result of loss of access is *damnum absque injuria*. The claimants cross-appeal on the ground of inadequacy resulting from the denial of additional consequential damages for alleged loss of visibility. The State does not dispute the direct damages portion of the awards (except for Claim No. 36695 with which we shall deal later) and we shall therefore concern ourselves with the sole question of the awards for consequential damages.

The appropriations were necessitated by the construction of Interstate Highway Route 81 near a shopping center site in the Town of Salina about five miles north of Syracuse. The claimant Northern Lights Shopping Center, Inc. (hereinafter referred to as Northern Lights) was owner of the center which was founded by one Porter, a shopping center developer, and the claimant North Star Realty Corp. (hereinafter referred to as North Star), which was actually an adjunct of Northern Lights, was subsequently incorporated in April of 1955. The latter was thereafter, but prior to the second appropriation, the grantee of portions of the original 42.5 acres of land owned by Northern Lights. It is well established by the evidence that by reason of interlocking directorates, identity of stockholders and officers, and reciprocal payment of obligations, these two corporations were in effect one entity. Although property was conveyed by Northern Lights to North Star during the interval between the two appropriations, all the property was used for the mutual benefit of both claimant corporations.

The history of the development and the physical layout of the center and the highways is most essential in the consideration of the substantial awards of $607,500 for consequential damages. At the time of the 1955 appropriation, the land was bounded on the north by Bear Trap Creek; on the east by Sand

Road, a comparatively minor service road; on the south by Sand Road; and on the west by State Highway Route 11 and County Highway 208, with a frontage of approximately 1,734 feet. Route 11 was a well-travelled undivided two-lane highway, the principal north-south road between Watertown and Binghamton. County Highway 208 formed a " Y " intersection with Route 11 and was also a well-travelled undivided two-lane highway constituting the principal road between Syracuse and Oneida Lake. On a generally oblong plot of land, the owners constructed buildings along the northerly, easterly and southerly boundaries and also a parking area which extended from the buildings westward to the westerly boundary. Passing around the rear of the buildings was a 30-foot right of way, the subject of an agreement between the two corporations, which permitted common use of not only this right of way but also of all the means of access to the buildings.

There were five means of access to the center, the principal two being near the termini of the westerly boundary, the northerly entrance leading from County Highway 208 and the southerly entrance from Route 11. Each of these two served as both an entrance and an exit. There were also two means of access to and from Sand Road, a service road, and these two means of access consisted of driveways to and from the center leading to Sand Road which constituted a southerly boundary. The fifth means of access was a right of way leading to the rear of the property from Sand Road where it abutted the property on the east. This right of way did not become a road until 1960.

In June of 1953 Porter became interested in developing this large regional shopping center. He negotiated with the owner, obtained options on the property in the Summer of 1953 and title passed on December 30, 1953. It is clear that as a result of discussions with engineers and other representatives of the State in late 1953 and early 1954, Porter and his architect were informed of the nature and extent of the proposed Interstate Highway 81, including the construction of a traffic circle. A rearrangement of traffic resulted from the overhead construction of Route 81 and the State constructed a traffic oval immediately opposite and west of the claimants' frontage. Southbound traffic from the north and east was fed into this oval. The traffic along Route 11 and County 208 passing in front of the center flowed one way in a northerly direction. Route 11 remained two-way south of Sand Road and County 208 remained two-way north of the shopping center.

Thereafter, Porter made application for a construction permit. Construction commenced on the buildings of Northern Lights in July, 1954 and the entranceways were constructed in the Summer of 1955 in accordance with the permit issued by the State. Before the construction of the entranceways and in the Spring of 1955, the State erected guardrails along its right of way on claimants' westerly frontage on Route 11 north of the south entranceway. Thereafter, the State filed appropriation maps resulting in the taking on August 23, 1955 of a one-foot strip of land 727 feet in length east of the guardrails, and designated the taking as "non-access". The guardrails were constructed to prevent interference with the flowing traffic pattern. For purposes of traffic safety, the State created a "weaving lane" on Route 11 and County 208 so as to facilitate the free flow of traffic from the time of entry until the time of departure. In 1958, the State widened the "weaving lane" in front of the center and at that time reconstructed each entrance so that there was an island between entrance and exit. The record demonstrates that the claimants could have constructed larger entrances. By using the oval, traffic coming from the north of the center was led into the "weaving lane" and could enter the center through the north entrance. Traffic did not need to use the oval but could proceed south to Sand Road or to the intersection south of Sand Road and by proceeding north on Route 11 and east on Sand Road could use the other entrances available.

The Court of Claims found that Sand Road was of no customer value, a finding contrary to the weight of the evidence. Although not equivalent in value or utility to the north and south means of access, the openings to Sand Road constitute reasonable ingress and egress. We do not agree with the finding that the 1955 appropriation as supplemented by the 1959 taking deprived claimants of suitable means of access.

The shopping center opened in November, 1955. Porter testified that accidents occurred near the entranceways and contended that by reason of the takings the traffic pattern of the parking lot was disrupted. The evidence as to accidents is very meagre and contained no names of persons, dates of accidents or any facts relating to the accidents to explain the reasons for them and any finding based upon this testimony that the State had created a dangerous condition would be against the weight of evidence.

During the interval between the two appropriations, a guardrail was erected on the east side of County 208 from a point

proximate to the north of the north entranceway to a point beyond the northerly property line of North Star's property. On April 21, 1959, the State widened the highway by appropriating in fee a strip which did not affect access. The southerly part of the strip was taken from Northern Lights and the northerly from North Star. The claimants argue that the guardrails constructed as the result of the 1959 taking bar access to County 208 along North Star's frontage and also contend that the State constructed a rampway at a point just north of the northerly entranceway during the construction of which the center line of Bear Trap Creek was moved southerly, constituting a *de facto* taking of claimants' property. (This relates to Claim No. 36695 to be discussed later.)

We are confronted with conflicting private and public rights, to wit: (1) those of an abutting landowner in enjoying unlimited access to a highway system and (2) those of the State in regulating highway traffic with a view to safety under heavy volume conditions. The legal issue simply stated lies in the divergent rights of private business, exemplified by this shopping center, to unrestricted access, as opposed to the rights of the public to regulate access in the interest of safe and efficient transportation. When these two rights conflict the public use of the highway is the predominating right (*Cities Serv. Oil Co.* v. *City of New York*, 5 N Y 2d 110). The rights of an abutting owner are subordinate to those of the State in the regulation of public highways for the benefit of the public and any inconvenience must be borne by adjoining landowners (*Cities Serv. Oil Co.* v. *City of New York, supra* [establishment of bus stop by city in front of plaintiff's gas station did not constitute unreasonable interference with ingress or egress]; *Jones Beach Blvd. Estate* v. *Moses*, 268 N. Y. 362 [access to parkway very inconvenient for traffic going in northerly direction — it was required to go 5 miles in a southerly direction and then turn northward]; *Perlmutter* v. *Greene*, 259 N. Y. 327 [erection of sign to obscure billboard — placing of screen at pronounced curve in narrow road so as to block view of large sign erected on adjacent private land]).

That damages resulting from circuity of access and diversion of traffic are not compensable has been definitely determined by the Court of Appeals and by this court in several recent decisions (*Selig* v. *State of New York*, 10 N Y 2d 34 [cars going north on Thruway diverted 10 blocks north of claimant's property and 8 blocks south of it]; *Nettleton Co.* v. *State of New York*, 11 A D 2d 899 [substitution of immediate access to

claimant's property from boulevard by access from a service road and from a street bounding property on the rear]; *National Biscuit Co.* v. *State of New York*, 12 A D 2d 998, mod. 14 A D 2d 729, affd. 11 N Y 2d 743 cert. den. 370 U. S. 924 [claimant not entitled, as abutting owner on street as it existed prior to appropriation, to recover for loss of easement of access to main highway, grade of which was lowered to approximately 15 feet below previous level and for which 32-foot service road was substituted as claimant's means of access]).

The common complaint in many of the cited cases was that following reconstruction, the bulk of traffic travelled on a new, depressed or elevated highway with no direct access to claimants' property from the new highways. However, service roads and other means of access were made available, as in the case at bar. As for circuity of access, an abutting owner has no legal right to travel from his property to his destination in the most direct way possible. As for diversion of traffic, an abutting owner has no right to the continuation of a flow of traffic in front of his property. The State's exercise of its police power in such situations is predominant and controlling (4 Nichols, Eminent Domain [3d ed.], § 14.2431, p. 594; Clarke, Limited-Access Highway, 27 Wash. L. Rev. 111, 125; 40 C. J. S., Highways, § 232). Claimants' effort to distinguish the above precedents by arguing there was no actual taking of the claimants' land in those cases or any narrowing of the claimants' means of access is without merit.

Under modern traffic conditions, even more so than in the less complicated vehicular environment of the past, the nature of the right of access makes it subordinate to the public right of safe travel. For example, in congested areas, complete extinguishment of existing rights of direct access may be necessary (*Department of Public Works* v. *Finks*, 10 Ill. 2d 20, 24; 139 N. E. 2d 242, 245). The highway fronting on this shopping center is necessarily a controlled access highway which gives preference to through traffic. Limited access is allowed where it does not constitute undue danger (Covey, Control of Highway Access, 38 Neb. L. Rev. 407, 421). The owner of a prospective commercial development abutting a highway does not have the right of direct access from every point along the highway (Covey, Control of Highway Access, 38 Neb. L. Rev. 407, 416; *Sauer* v. *City of New York*, 180 N. Y. 27, affd. 206 U. S. 536).

Right of access means reasonable ingress to and egress from abutting land to a system of public highways subject to reason-

able traffic regulations unaffected by any diversion of traffic on the road or any circuity of travel encountered, once on the highway (Covey, Right of Access and the Illinois Highway Program, 47 Ill. Bar Journal 634). This right is subject to the fullest reasonable exercise of the public's primary right of travel and, accordingly, damages resulting from reasonable traffic regulations are noncompensable (*Red Apple Rest.* v. *McMorran,* 12 N Y 2d 203; *McHale* v. *State of New York,* 278 App. Div. 886, affd. 304 N. Y. 674; Covey, Highway Protection Through Control of Access and Roadside Development, 1959 Wis. L. Rev. 567, 573). In the *Red Apple* case, the Court of Appeals determined that under the Highway Law and the police power, the State has the right to erect guardrails on appropriated property along 750 feet of frontage used for a parking lot for purposes of effectuating safe channeling of traffic. In *McHale,* it was decided that consideration should not be given to diminution of an unappropriated portion of claimant's property as the result of a series of cloverleaf constructions and consequent diversion of traffic from a tavern no longer facing on the main thoroughfare.

In respect of North Star's Claim No. 36695 as a result of the 1959 taking, the Court of Claims found direct land damage in the amount of $6,000, which is undisputed by the State, and consequential damages in the amount of $25,000 arising out of (1) the moving of the creek bed, (2) the erection of a guardrail across the frontage of North Star and (3) deprivation of North Star's rear area movements. This $25,000 award includes both consequential and lack-of-access damages without any allocation of amounts to either category. Because of the common use by the corporations of all means of access and because of the adequacy of the means of access, there is some question as to whether any consequential damages should be allowed North Star for lack of access. In any event, the *de facto* taking damages, resulting from the movement of the creek bed, southerly, should be differentiated from the lack-of-access damages. Accordingly, a new trial of this claim only is necessary so that the award will appropriately designate the consequential damages, if any, flowing from the *de facto* taking and the lack-of-access damages, if any.

In summary, we affirm that part of the judgment in Claim No. 34798 which awards $6,000 for direct damages and $3,500 for the temporary easement and that part of the judgment in Claim No. 36697 which awards $7,500 for direct damages. We disallow any consequential damages and modify the judg-

ments in these two claims accordingly. The judgment in Claim No. 36695 is reversed and a new trial of this claim ordered.

WILLIAMS, P. J., BASTOW, HENRY and NOONAN, JJ., concur.

Claim No. 34798 — Judgment unanimously modified on the law and facts in accordance with the opinion and as modified affirmed, without costs of these appeals to either party. Certain findings of fact and conclusions of law disapproved and reversed and new findings and conclusions made.

Claim No. 36697 — Judgment unanimously modified on the law and facts in accordance with the opinion and as modified affirmed, without costs of these appeals to either party. Certain findings of fact and conclusions of law disapproved and reversed and new findings and conclusions made.

Claim No. 36695 — Judgment unanimously reversed on the law and facts, and a new trial granted, without costs of these appeals to either party.