No. 44,029

ROBERT L. BROCK and EDWIN R. LINQUIST, *Appellants*, v. STATE HIGHWAY COMMISSION OF KANSAS, *Appellee*, and RUTH O. RAGSDALE, *Appellant*, v. STATE HIGHWAY COMMISSION OF KANSAS, *Appellee*.

(404 P. 2d 934)

Opinion filed August 19, 1965.

*Gerald L. Goodell,* of Topeka, argued the cause, and *Lester M. Goodell, Marlin S. Casey, Raymond Briman, Murray F. Hardesty, Wayne T. Stratton, Robert E. Edmonds* and *Arthur E. Palmer,* attorneys for appellants, Brock and Linquist, and *Harold E. Doherty, Ernest J. Rice* and *James E. Benfer,* attorneys for appellant, Ragsdale, all of Topeka, were with him on the briefs for the appellants.

*Jacob A. Dickinson,* of Topeka, argued the cause, and *Charles N. Henson,* Chief Attorney for State Highway Commission, and *Mark L. Bennett, Jr.,* both of Topeka, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HATCHER, C.: This is an appeal from a verdict and judgment denying damages for the alleged deprivation of the plaintiffs' common-law right to direct access to a pre-existing highway.

Plaintiffs own, as tenants in common, a tract of land bounded on the north by U. S. Highway 24 beginning at a point 150 feet

east of Rochester Road (North Tyler Street), Topeka, Kansas, thence east 575 feet. The other boundary lines are not material to the controversy.

In September, 1951, defendant condemned certain parcels of real estate lying directly north of the above described land for the purpose of widening U. S. Highway 24. No appeal was taken from the appraisers' award. Neither were rights of access mentioned in the condemnation proceedings.

The 1953 session of the Kansas legislature enacted K. S. A. 68-1901, *et seq.*, which specifically provided for the designation of controlled access facilities, and for the acquisition, by condemnation, of rights of access facilities, including rights of access, light, air or view.

On November 9, 1955, part of U. S. Highway 24, including the strip north of plaintiffs' land, was by resolution of the State Highway Commission of Kansas declared to be a controlled access facility and the Right-of-Way Department was authorized to acquire the right-of-way and access rights necessary to effect such a project. In the late fall of 1956, the defendant constructed a frontage road on the land acquired from plaintiffs by condemnation in 1951, lying between the plaintiffs' land and the through lanes of U. S. Highway 24.

At and prior to the adoption of the resolution providing for the controlled access facilities and the construction of the frontage road there were located on plaintiffs' frontage land four business establishments holding leases from plaintiffs consisting of a Dairy Freeze Drive-In, a Sinclair Refining Company oil and gas station, a cafe and a Texas Company oil and gas station. Prior to the construction of the frontage road each of the businesses mentioned had direct access to and from U. S. Highway 24.

As a result of the construction of the frontage road it became necessary, in order to gain entrance to said business establishments from the highway and in order to enter the highway from the business establishments, to go to such points as access facilities have been constructed by defendant for such purpose, *i. e.*, at each end of the 575 foot frontage.

The plaintiffs brought an action against the defendant for damages. The petition as amended alleged the facts as above stated and further alleged:

"Although said frontage road between plaintiffs' property and the through lanes of Highway 24 has long been completed, no condemnation proceedings

have been instituted by the defendant, nor has any compensation in any form been paid to plaintiffs for the loss of direct access to the said business establishments located on their said property as herein alleged."

The prayer was for damages in the sum of $88,750.00.

The defendant answered alleging that plaintiffs had been furnished reasonable, direct and convenient access to and from the four main traveled lanes of U. S. Highway 24 and that the frontage road had been constructed at public expense for the special use and benefit of plaintiffs' property and that there is no physical barrier separating plaintiffs' property from the frontage road. The answer further alleged:

"Defendant State Highway Commission has constructed cross-over openings at the east and west ends of plaintiffs' property for the special use and benefit of plaintiffs and their tenants, permitting thereby convenient and direct access to or from the four main traveled lanes of U. S. 24 to plaintiffs' property.

"Defendant State Highway Commission denies that it has taken any property or compensable property rights of plaintiffs, their tenants or lienholders and further denies that it is responsible for, or liable for, depreciation of market value of plaintiffs' property, if any, at the time of the alleged taking of property or property rights in 1956."

The issues were tried to a jury which found generally for the defendant. Judgment was entered on the verdict and plaintiffs have appealed.

Although the appellants raise numerous trial errors, the merits of this case will be determined on appellants' contention that—

"It was error for the court not to rule as a matter of law that the Defendant (Appellee) acquired the access rights of the Plaintiffs (Appellants) and to direct a verdict in this regard for Plaintiffs (Appellants)."

In support of the above contention the appellants argue that "the construction of a frontage road between a landowner's property and a pre-existing public highway is the taking of the common-law right of direct access as a matter of law." Some of our decisions cited by appellants, and which will be considered later, would appear to support their argument. However, it would also appear that controlled access highways, and the necessity therefore, under our modern addiction to increased speed on the highways, has created an entirely new concept not known at the time the common law or case law was developed.

This new concept, which was not fully recognized in our previous decisions, requires a complete review and reappraisal of the correlative rights of the general public and owners of abutting lands

where controlled access highways are reasonably necessary to protect the safety and convenience of the traveling public.

Before reaching the main point at issue we should give attention to some procedural matters.

Where the right of eminent domain has not been exercised by the State Highway Commission and an abutting property owner is aggrieved because he feels that his access to a controlled access highway has been unreasonably restricted, the remedy is by way of an action for damages in the nature of a suit on an implied contract. In *Dugger v. State Highway Commission*, 185 Kan. 317, 321, 342 P. 2d 186, we stated:

". . . Where the commission has appropriated land or rights therein for state highway purposes without having obtained the title thereto, by formal condemnation or otherwise, the landowner may waive formal condemnation and may sue upon an implied contract for the value of the property taken. This is substantially the rule stated in *State Highway Comm. v. Puskarich*, 148 Kan. 388, 83 P. 2d 132, which was cited with approval in the subsequent case of *Atchison v. State Highway Comm.*, 161 Kan. 661, 663, 171 P. 2d 287." (See, also, *Cohen v. St. L., Ft. S. & W. Rld. Co.*, 34 Kan. 158, 8 Pac. 138; *Railroad Co. v. Yount*, 67 Kan. 396, 73 Pac. 63; *K. C. & S. W. Rly Co. v. Fisher*, 53 Kan. 512, 36 Pac. 1004; *Hubbard v. Power Co.*, 89 Kan. 446, 131 Pac. 1182.)

Since the landowner has an adequate remedy at law he cannot proceed by injunction or mandamus to protect himself from the alleged wrongful taking of his access without compensation. (*Brookings v. Riverside Drainage Dist.*, 135 Kan. 234, 9 P. 2d 656.) When the taking is by a governmental agency of the state such as the State Highway Commission the public's credit, with the power of taxation behind it, affords ample security for the payment of any judgment recovered in an action at law on an obligation to make compensation. (*Railway Co. v. City of Hiawatha*, 95 Kan. 471, 148 Pac. 744.)

In *Atchison v. State Highway Comm.*, 161 Kan. 661, 171 P. 2d 287, it was stated:

"A plaintiff may not invoke the extraordinary writ of mandamus where he has a plain, speedy and adequate remedy available to him in ordinary course in an action at law.

"Where the state highway commission, which has the power of eminent domain, appropriates the land of any person for state highway purposes without having first acquired the title thereto by formal condemnation or otherwise, the commission is under an implied contractual obligation to pay to the owner the reasonable value of the land it took without condemnation." (Syl. 1 and 2.)

Also in *Provident Mut. Life Ins. Co. v. State Highway Comm.*, 155 Kan. 351, 125 P. 2d 346, in denying injunctive relief, we held:

"In a suit to enjoin the state highway commission from a continuing trespass arising from maintenance of a state highway on, over and across real estate in which the commission had been adjudged previously to have no right or title, *it is in the public interest that no injunction should be granted*, but in view of the fact the commission has the power of eminent domain, the court should hear the evidence pertaining thereto and award to the owner and against the commission such sum as the owner is justly entitled to under the facts and circumstances of the case." ( Syl. 3; emphasis supplied.)

In view of what has been said above we are forced to disapprove the decisions in *Franks v. State Highway Commission*, 182 Kan. 131, 319 P. 2d 535 and *Atkinson v. State Highway Commission*, 184 Kan. 658, 339 P. 2d 334, which decisions approved injunctive relief as against the State Highway Commission in highway access disputes.

The trial court, by its instructions, left to the jury for its determination whether there was a taking of access such as required compensation. The appellants contend that "the trial court's failure to instruct the jury that the construction of the frontage road in question was the taking of a property right was prejudicial error."

Although we cannot agree with the conclusion which appellants would reach, we do agree with the legal premise on which they base their conclusion as follows:

". . . The appellants contend that it was highly prejudicial and clearly error to let the jury decide if there had been a taking. If the appellants did not establish a taking of access rights, there should have been no question whatsoever for the jury to decide. As in any other condemnation case, whether there is a taking of a property right is a question of law, and must be decided by the court. . . ."

The appellee contended that it had the right under the police power to limit or control appellants' access as it did. Whether or not a governmental agency has exceeded its police power and taken private property for public use is a question of law for the determination of the court under the existing facts and circumstances of the particular case. Not until the trial court determines that private property has been taken for public use is the question of the amount of damages ripe for the determination of a jury.

In all condemnation cases the only question presented for the jury's determination is the loss to the owner because of the property taken. The fact that there was a taking has been previously determined by the court.

An action to recover damages for the taking of private property for public use is in the nature of an inverse condemnation proceeding. The same rules of law apply to the determination of the right to damages and the measure of damages as in a condemnation proceeding.

In *Roberts v. Upper Verdigris Watershed,* 193 Kan. 151, 392 P. 2d 914, we held:

"Parol evidence as to intended use is not admissible to vary the extent of the use as stated in the commissioners' report on appeal from the commissioners' award of compensation to the landowners." (Syl. 3.)

and concluded that the trial court erroneously admitted evidence for the jury's consideration as to the extent of the use, which would reflect on the extent of the property taken.

We must conclude that in an inverse condemnation proceeding a trial court should either instruct the jury that there was a compensable taking or direct a verdict for the defendant.

This brings us to the crux of this controversy.

The appellants contend that the construction of a frontage or a service road between appellants' property and the pre-existing U. S. Highway 24 constitutes a taking of the common-law right of direct access as a matter of law. Whether we desire to refer to the access rights of an owner of land abutting a highway as "common law rights" or "case made rights" they are rights which have been developed by the courts and not by the legislature.

Regardless of the source of origin there has developed a universal rule that the owner of land abutting on a street or highway has a private right in such street or highway, distinct from that of the public, which cannot be taken or materially interfered with without just compensation. However, the rights of an abutting owner must be subordinated to the right of the public to the proper use of the highway and the right of governmental agencies to enforce proper police regulation. The right is subject to reasonable regulation and restrictions for the purpose of providing reasonable safe passage for the public, but the regulations or limitations cannot be enforced where they unduly limit or unreasonably interfere with the rights of the abutting owners. The established easement which has been used for access purposes cannot be taken without compensation, but, while the entire access may not be cut off, an owner is not entitled to access to his lands at all points in the boundary between it and the highway. If the owner has a free and convenient access to his property and to his improvements thereon, and his means of in-

gress and egress are not substantially interfered with by the public, he has sustained no compensable loss.

In applying the above recognized rules the difficulty has arisen in determining, under the facts and circumstances of each particular case, just what is free and convenient access and what constitutes substantial interference. It must be understood that the rules were adopted and applied to conventional or land service roads. At the time the rules were developed roads were constructed largely for the benefit of the local property owners as land service roads and for the benefit of the local inhabitants. Speedways, interstate highways, freeways and other thoroughfares for the handling of long distance travel by controlling access were not anticipated. These roads are constructed today to serve the traveling public rather than the local needs of abutting property owners. The rules announced above are too well established to justify extensive citations of authority. A full discussion will be found in *Smith v. State Highway Commission*, 185 Kan. 445, 451, 346 P. 2d 259. Those wishing to research the development of the rules of law applicable to the right of access to conventional or land service roads may see 25 Am. Jur., Highways, § 154, p. 448; 39 C. J. S., Highways, § 141, p. 1079, and 73 A. L. R. 2d 652.

In considering a new highway concept in connection with rights of access it must be understood that the common-law right to use of highways has not followed an established precedent through the ages. Each era of history has seen a reformulation of highway rights based on changes in commerce and the needs of the landowners and the traveling public.

In early England the King's Highway was a perpetual right to free passage of the sovereign and his subjects over another's land. The colonial governments did not follow the English concept. The early Americans were more interested in rural activities. Farm animals needed to be controlled by enclosures; therefore, it became the practice to license the construction of gates across highways. This concept changed when inter-continental travel became prevalent. In the twentieth century there has been a revolution in transportation caused by the automobile. The number and speed of automobiles engaged in interstate travel have caused another change in concept. Controlled access highways have become a public convenience and necessity.

Any common-law rules or case-made laws relating to highway rights were adaptable to circumstances and left capacity for growth.

A present statement of public and private highway rights must reflect prevailing conditions.

Without entering into an extended discussion as to what does or does not constitute undue interference with access rights on a conventional or land-service highway we are forced to conclude that the doctrine granting a right of access to abutting landowners as developed for conventional or land-service highways does not have the same application to controlled access highways.

The courts have been in disagreement as to what constitutes undue limitations or unreasonable interference with the rights of an abutting owner. They are in even a more hopeless conflict when it comes to applying the doctrine to controlled access highways. The courts of the various jurisdictions, including our own, are not only in conflict but the judges constituting the various courts are in disagreement. It is difficult to find an opinion on the matter which is not accompanied by concurring and dissenting opinions.

It would serve no useful purpose to attempt to classify the numerous cases in an effort to follow the general rule. There is no general rule. There are well written opinions supporting and denying numerous degrees of access restrictions under the same facts and circumstances.

We believe that it will be most helpful if we state clearly the rules which are to be made applicable in this state under the circumstances without any confusion by reference to rules established by existing foreign decisions.

The appellants vigorously contend that the controlled access facilities statute (K. S. A. 68-1901, *et seq.*) is a mandatory provision requiring condemnation and payment of damages when access rights are restricted. We do not agree with this construction. The statute in no way attempted to restrict the state's existing right to control access under the police power. The act was no doubt intended to give the State Highway Commission authority by condemnation to take the right of access in its entirety. This could not be done under the police power. An owner of land abutting a highway could not be placed in a *cul-de-sac* under the case made law. This was the right that was extended by the controlled access facilities statute. Perhaps the chief design of the statute was to permit the State Highway Commission to meet the standards of the federal laws. It was more in the form of an enabling statute to meet the requirements of the federal Interstate and Defense High-

way System. (23 U. S. C. A. § 101, *et seq.*) The standard adopted for the Interstate and Defense Highway System required that states be able to acquire access rights abutting thereon.

It has been decided that there is no right of access where a new controlled access highway has been established where none previously existed. In *Moore v. State Highway Commission*, 191 Kan. 624, 627, 383 P. 2d 549, it is stated:

". . . We stated in the *Riddle case* [184 Kan. 603, 339 P. 2d 301] at page 610 that where a new controlled access highway is established by the commission through property where no highway previously existed, there is no *taking* of a right of access since such right of access never in fact existed. See *Schnider v. State of California*, 38 C 2d 439, 241 P. 2d 1, 43 A. L. R. 2d 1068; *State ex rel. State Highway Comm. v. Clevenger*, 365 Mo. 970, 291 S. W. 2d 57; *State Highway Com. v. Burk et al.*, 200 Or. 211, 265 P. 2d 783; *Carazalla v. State*, 269 Wis. 593, 608a, 70 N. W. 2d 208; *State v. Calkins*, 50 Wn. 2d 716, 719, 314 P. 2d 449. See, also, articles entitled: *The Limited Access Highway*, 27 Wash. L. Rev. 111; 13 Mo. L. Rev. 29; *Freeways*, 3 Stanford L. Rev. 298; Institute on Eminent Domain, Southwestern Legal Foundation, Dallas, Texas (1962) p. 46."

We adhere to the rule that the owners of abutting lands have a right of access to the public road system but it does not follow that they have a right of direct ingress and egress to and from a controlled access thoroughfare. The right of access, if it can be determined to be a right under such circumstances, is the right to reasonable, but not unlimited, access to and from the abutting lands.

Although an abutting landowner has a right to use a highway he cannot be heard to say that he has been deprived of his right or compensably damaged because he does not have direct access to a certain highway where public judgment dictates that access to and from the highway should be controlled and is subject to control under the police power of the state.

The appellants complain that they do not have direct access from their property to the highway. The property abuts on a frontage or service road. Appellants have access to the frontage road at all points at which it abuts their property. There is no suggestion that the frontage or service road is not of proper quality. It is part of the state highway system. Appellants are granted access to the main highway at the east and west ends of their property. Appellee has constructed cross-over openings for their special use and benefit. Such cross-over openings are only 575 feet apart.

Circuity of travel, necessarily and newly created, to and from real property, does not of itself result in legal impairment of the

right of ingress and egress to and from such property and a controlled access highway.

The common complaint is made here that following reconstruction, the bulk of traffic traveled on the main highway with no direct access to claimants' property from the thoroughfare. As for diversion of traffic, an abutting owner has no right to the continuation of a flow of traffic in front of his property. The state's exercise of its police power in such situations is predominant and controlling. The owner of abutting land has no property right in the traveling public using the highway. The state may abandon or reroute an existing highway without any liability to the owners of abutting lands.

The increasing number of accidents and vehicles on our highways cogently indicates the necessity of having a highway system which affords safety and permits the free flow of traffic. Such a system requires traffic control devices such as limited access highways, one-way streets, express thoroughfares, medial dividers, barrier curbs and the like. These and other traffic control devices may, on occasion, place a restriction on an abutting property owner's free and convenient access to his property, but as long as the restriction is reasonable the courts will not interfere.

We are forced to conclude that appellants were not denied access to the highway system since the frontage road itself is a part of the highway system to which appellants admittedly have access at all points at which it abuts their property. The frontage road in turn provides them access to the through-traffic lanes by points of connection between the frontage road and the through-traffic lanes of U. S. Highway 24. Access is not denied but traffic is regulated within the scope of the police power of the state acting through the State Highway Commission.

As previously stated it would serve no useful purpose to review the numerous conflicting decisions dealing with the foregoing conclusions. We would be doing nothing more than competing with established research books. The cases may be found by reference to the later volumes of West's Digest System, Highways, Key No. 85, and 43 A. L. R. 2d 1072, with particular attention to the Annual Supplemental Service. We would also recommend consideration of the following cases as presenting well reasoned opinions which have influenced us in reaching the conclusions herein: *Tift County v. Smith.,* 219 Ga. 68, 131 S. E. 2d 527; *Dept. Public Works & Bldgs.*

*v. Farina,* 29 Ill. 2d 474, 194 N. E. 2d 209, 213; *Ryan v. Rosenstone,* 20 Ill. 2d 79, 169 N. E. 2d 360, 362; *Commonwealth v. Carlisle,* Ky., 363 S. W. 2d 104, 107; *Nichols v. Commonwealth.,* 331 Mass. 581, 121 N. E. 2d 56; *Burnquist v. Cook,* 220 Minn. 48, 19 N. W. 2d 394; *Painter v. State, Department of Roads,* 177 Neb. 905, 131 N. W. 2d 587, 591; *State v. Danfelser,* 72 N. M., 361, 384 P. 2d 241; *Northern Lights Shopping Center, Inc. v. State,* 247 N. Y. S. 2d 333, 338; *State Highway Com'n v. Raleigh Farmers Market, Inc.,* 263 N. C. 622, 139 S. E. 2d 904, 906; *State, ex rel. v. Linzell,* 163 Ohio St. 97, 126 N. E. 2d 53; *Kohler v. Brindley, Exr.,* 116 Ohio App. 241, 187 N. E. 2d 393; *State ex rel. Ashworth v. Road Comm.,* 147 W. Va. 430, 128 S. E. 2d 471, 475, and *Stefan Auto Body v. State Highway Comm.,* 21 Wis. (2d) 363, 124 N. W. 2d 319.

Appellants cite *Franks v. State Highway Commission,* 182 Kan. 131, 319 P. 2d 535 and *Atkinson v. State Highway Commission,* 184 Kan. 658, 339 P. 2d 334, as determinative of the controversy. The two decisions do appear to support appellants' contention. However, they did not recognize the new concept of controlled access highways; they are contrary to the law as expressed in this opinion, and are therefore overruled.

The appellants also rely on *Smith v. State Highway Commission,* 185 Kan. 445, 346 P. 2d 259. The case does not support appellants' contention. Although the Smith case discussed generally the law as it relates to highway access rights, the case was decided on other grounds as stated at page 461 of the opinion:

"The State Highway Commission filed a petition in eminent domain seeking to *acquire* rights of access thereby. Upon the docketing of the action this petition became the jurisdictional instrument upon which the trial was conducted. (See, *Sutton v. Frazier,* supra, and cases cited therein.) It is apparent from the petition the Commission elected *to acquire* by eminent domain the abutting landowners' rights of access. Upon the date of the *taking* the Commission had absolute power to control the access of the appellees and their successors in title to the 1410 feet of access acquired with the exception of the 40-foot Fort Markley entrance reserved to the appellees."

In the above case the State Highway Commission elected to proceed by condemnation rather than under the police power. Eminent domain proceedings are based on the taking of a property right. A condemnation proceeding is an admission by the condemner that private property is being taken for public use. This was the point on which the Smith case was determined.

Although we cannot place our approval on the procedure which was followed in the instant case, the final judgment denying relief to the plaintiffs was proper.

The judgment is affirmed.

APPROVED BY THE COURT.

SCHROEDER, J., dissenting: I must respectfully dissent on the ground the court has completely reversed its previous construction of the controlled access facilities statute (K. S. A. 68-1901 to 68-1906, inclusive), as recently announced in *Smith v. State Highway Commission,* 185 Kan. 445, 346 P. 2d 259.

In my opinion previous decisions of this court have construed the controlled access facilities statute as having defined the state's policy on frontage roads, and these decisions should control the issue here presented.

The difficulty of the court on questions involving access on Kansas highways is clearly indicated by the decision in *Riddle v. State Highway Commission,* 184 Kan. 603, 339 P. 2d 301. There the opinion written for the court was not approved by any single member of the court. The writer of the opinion dissented in part, which was joined by another Justice; two Justices concurred in the result; one Justice wrote a concurring opinion in which another joined; and still another Justice concurred in the opinion written for the court as supplemented by the written concurring opinion.

The *Riddle* case was filed May 16, 1959, approximately eighteen months after the decision in *Franks v. State Highway Commission,* 182 Kan. 131, 319 P. 2d 535, which was decided by a unanimous court. On the same day the *Riddle* decision was filed, the decision in *Atkinson v. State Highway Commission,* 184 Kan. 658, 339 P. 2d 334, was filed in which one Justice concurred in the result and another Justice dissented. Approximately six months after *Riddle* the decision in *Smith v. State Highway Commission,* 185 Kan. 445, 346 P. 2d 259, was filed with one member of the court dissenting. It has been thought for all practical purposes among the members of the Bench and Bar that the *Smith* decision had settled the question of access rights in the state of Kansas under the controlled access facility statute.

While factually the decision in *Smith* is distinguishable from the factual situation presently confronting the court, the *Smith* decision was bottomed directly upon legislation enacted as the controlled

access facility statute. In the opinion, after defining and discussing the distinction between the state's police power and its power of eminent domain at pages 453 and 454, the court said:

"Our determination of how far the State Highway Commission can proceed under the police power to curtail or restrict the rights of access of an abutting property owner is materially assisted by legislative enactments." (p. 455.)

After the foregoing paragraph the history of legislative enactments and the present controlled access facility statute was discussed at pages 455, 456 and 457. The court then concluded:

"We think it clear that the legislature by enacting the controlled access facilities statute has spoken on the subject of controlled access highways. By the provisions of 68-1903, *supra*, it has prescribed the *exclusive* methods by which private or public property, including rights of access, may be *acquired for the establishment of controlled access facilities*—that is, 'by gift, devise, purchase or *condemnation, in the same manner as now or hereafter authorized by law for acquiring property or property rights.*' (Emphasis added.) The legislature intended by 68-1903, *supra*, that a landowner deprived of abutters' rights of access would be compensated for them." (p. 457.)

It should be noted the court specifically stated the legislature had spoken on the subject of controlled access highways and prescribed *the exclusive methods* by which private or public property, including rights of access, *may be acquired for the establishment of controlled access facilities.*

By the decision herein the court has reconstrued the statute by holding the State Highway Commission need not acquire rights of access to establish a controlled access facility—that the provisions of the statute with respect to the acquisition of rights of access are permissive instead of mandatory.

For the reasons hereafter assigned, it will be shown the sections of the statute in question are not subject to such interpretation. Elucidation in the construction of these statutes first occurred in *Atkinson v. Sate Highway Commission,* supra, as follows:

"The commission argues there must be an unreasonable, arbitrary, complete or some other equivalent *acquisition* of the rights of access, but the legislature, in its wisdom, did not see fit to put any limit on the amount of access required *to be taken* before the commission must resort to condemnation if it were not *acquired* by gift, devise or purchase. We think the statute means just what it says.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"To hold that the above section does not require the commission to compensate a landowner for *the taking of his rights of access* would be neither an ordinary nor a judicial interpretation of the statute." (pp. 663, 664.) (Emphasis added.)

The controlled access facility statute is set out in K. S. A. 68-1901 to 68-1906, inclusive.

K. S. A. 68-1901 defines a controlled access facility as:

"(a) 'A controlled access facility' means a highway, road or street espically [*sic*] designed to expedite and control through and local traffic, and over, from or to which highway, road or street, *owners or occupants of abutting property shall have only a controlled right or easement of access,* light, air or view. Such highways, roads or streets may be opened to use by all customary forms of street and highway traffic, or they may be parkways from which designated vehicles shall be excluded." (Emphasis added.)

The same section defines a frontage road as follows:

"(c) 'Frontage road' means a highway, road or street *which is auxiliary to and located on the side of another highway, road or street for service to abutting property and adjacent areas and for control of access to such other highway, road or street.*" (Emphasis added.)

K. S. A. 68-1902 confers upon highway authorities the power to establish controlled access facilities and reads:

"The state, county or city highway authorities, acting alone, or cooperating with each other or with any federal, state or local authority, or any other state, are hereby authorized to design, designate, establish, regulate, vacate, alter, improve, construct and maintain controlled access facilities wherever such highway authorities determine that traffic conditions, present or future, justify such facilities, and said highway authorities may regulate and restrict the use of such facilities by the various classes of vehicles or traffic in a manner consistent with the purposes and provisions of this act. *The highway authorities may so regulate, restrict or prohibit access to a controlled access facility so as to best serve the traffic for which such facility is intended.*" (Emphasis added.)

K. S. A. 68-1903 provides for the acquisition of property and property rights as follows:

"The highway authorities, jointly or severally, may acquire the desired private or public property, including rights of access, light, air or view for controlled access facilities, by gift, devise, purchase or condemnation, in the same manner as now or hereafter authorized by law for acquiring property or property rights in connection with highways, roads and streets within their respective jurisdictions."

K. S. A. 68-1904 provides that highway authorities may designate and establish controlled access highways as new and additional facilities, or an existing street or highway may be included within such facility, etc.

K. S. A. 68-1905 concerns frontage roads and reads:

"The highway authorities, in order to carry out the purposes and provisions of this act, are authorized to design, designate, establish, regulate, vacate, alter, improve, construct, and maintain frontage roads *and to exercise the same juris-*

*diction thereof as is authorized over controlled access facilities under this act, and such frontage roads shall be separated from the controlled access facility as may be deemed proper and necessary by the respective highway authorities."* (Emphasis added.)

What the legislature has said in substance is that highway authorities may establish controlled access facilities, and when established may so *regulate, restrict or prohibit access to such facility* as to best serve the traffic for which such facility is intended. Further, that highway authorities to carry out the purposes of the act may provide frontage roads, and when established may so *regulate, restrict or prohibit access from the frontage road to the controlled access facility* so as to best serve the traffic for which such facility is intended.

Under the foregoing statutes once a controlled access facility has been established by designation or act, the highway authority has absolute power to prohibit access to the main traveled portions of the highway from any source, including the frontage roads.

Viewed in this light 68-1903, *supra,* authorizing the acquisition of property and property rights seems to have but one meaning. That is, where a controlled access facility is established, all property rights, including the right of access, must be acquired by gift, devise, purchase or condemnation.

An analogous situation is presented in *Roberts v. Upper Verdigris Watershed,* 193 Kan. 151, 392 P. 2d 914. There a watershed district condemned certain land below 1320 feet mean sea level, which covered 60 acres. The land was taken for the permanent storage and temporary detention, either or both, of any waters that are impounded, stored or detained by the detention structure and for the operation of said waters and the inspection and maintenance of said area to be flooded.

The condemning authority contended that only a portion of the area would be covered by water, except in flood periods when water would be temporarily impounded over a greater portion of the land condemned, and sought to have the value of the property determined on the basis of the limited use which would be made of the land temporarily flooded. The trial court upheld the watershed district's contention, and this court reversed holding that the landowners were entitled to compensation based on the full use which the condemner had the right to exercise over the easement condemned as described in the commissioners' report.

And so in the instant case where a controlled access facility is

established by the State Highway Commission, to which it by statute has the absolute power to prohibit access, the landowners are entitled to compensation to the full extent of the loss which they might eventually suffer. This was the mandate of the legislature when it enacted the controlled access facility statute.

For example, on the facts in the instant case the entrances permitted from the frontage road to the main traveled portions of the highway may be reasonable at present, but future traffic conditions may so change the need for further regulation as to require the closing of such entrances, and provide access to the main traveled portions of the highway at points twenty miles on either side of the abutting property in question. Complaint by the abutting landowner at that time will undoubtedly be met by the Commission contending that the statute gives it such authority because the controlled access highway has already been established.

Cases in other jurisdictions as to whether the landowners of property abutting a frontage road should be compensated or not for loss of direct access fall into three major categories:

(1) Any loss resulting from being placed on a frontage road should be compensated in eminent domain, but the existence of the frontage road should be considered in mitigation of the loss suffered.

(2) Any loss resulting from being placed on a frontage road should be compensated in eminent domain only where accompanied by an otherwise compensable taking of land, and the existence of a frontage road should be considered in mitigation of the loss suffered in those cases.

(3) Any loss resulting from being placed on the frontage road should not be compensated in eminent domain whether land is taken or not.

The court in the instant case has done an about-face by jumping from position No. 1 (supported in *Franks v. State Highway Commission,* supra; *Atkinson v. State Highway Commission,* supra; and *Smith v. State Highway Commission,* supra) to position No. 3, subject, however, to the qualification that the restriction of access to the abutting property owner by the State Highway Commission must be reasonable. This switch has been accomplished in spite of a statute which defines the state's policy on frontage roads.

In an extended article entitled FRONTAGE ROADS: TO COMPENSATE OR NOT TO COMPENSATE, (Nov.-Dec. 1961) by Frank M. Covey, Jr., in 56 Nw. U. L. Rev. 587, the author points out, as a result of a survey conducted in the fifty states, the Highway Commission's practice in a majority of the states compensates the abutting property owner where a frontage road is provided upon a controlled

access facility, and most of them base an award of damages on the decline in the market value of property as a result of being placed on the frontage road, or the standard "before and after" valuation test. The author in the beginning paragraphs of his article reviews the advent in 1956 of the federal interstate and defense highway system and shows that the federal share, unlike the ordinary federal aid highways in which the federal government participates in the cost on a fifty-fifty basis, is to be 90 percent. This may have a bearing on why most states compensate their residents for the damage they suffer.

The Kansas legislature in 1953 enacted the controlled access facility statute to enable such highways in Kansas. On a factual situation substantially the same as the instant case, this court in *Franks v. State Highway Commission,* supra, in December, 1957, construed the statute for the first time. It was elucidated in *Atkinson v. State Highway Commission,* supra, and broadened in *Smith v. State Highway Commission,* supra. The access the court was speaking of in these cases was direct access to the main traveled portion of the highway. This construction of the statute—mandatorily requiring the acquisition of property rights, including the right of access of an abutting property owner, to establish a controlled access facility—has stood for over seven years and the legislature has not seen fit to change it. Under these circumstances it must be assumed the legislature has approved such construction placed upon the statute by the court. The authorities on statutory construction so holding are legion.

It is respectfully submitted the judgment of the lower court should be reversed.

FONTRON, J., concurring: Under our decision in this case, the question of whether there has been a compensable taking of an abutting owner's right of access to a controlled access highway or merely a restriction of his right of access thereto under the police power hinges, in the final analysis, on whether the restriction is reasonable. I cannot agree that this is always a question of law to be settled by the trial court. In my view, it is only when it can be said that reasonable minds could not differ that the question becomes one of law for the court to decide; otherwise, the issue of the reasonableness of a restriction is one of fact for a jury's determination.

I agree that, under the particular facts of this case, no jury issue is presented. The plaintiffs are provided access to the through-traffic lanes of Highway 24 at two points, only 575 feet apart. This access, I believe, can be said to be reasonable as a matter of law; hence, no compensable taking occurred. However, in cases where there is room for honest difference of opinion as to whether the limitation placed on a landowner's right of access is reasonable, the matter should, in my judgment, be submitted to a jury for decision.

WERTZ, J., joins in the foregoing concurring opinion.