No. 73,571

LENA GARRETT, *Appellee,* v. CITY OF TOPEKA, a municipal corporation, *Appellant.*
(916 P.2d 21)

Opinion filed April 26, 1996.

*Anne Lamborn Baker*, of Wright, Henson, Somers, Sebelius, Clark & Baker, LLP, of Topeka, argued the cause and was on the briefs for appellants.

*Gerald L. Goodell*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, argued the cause, and *Curtis J. Waugh*, of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Landowner initiated an inverse condemnation action, claiming that a city resolution placed limits on the right of commercial access from her property to the street and constituted a taking of the property. The trial court found that a taking of private property had occurred and awarded judgment to landowner. The City of Topeka (City) appeals. Jurisdiction is pursuant to K.S.A. 20-3018(c) (transfer from Court of Appeals on this court's own motion).

The facts are uncontroverted. In 1988 plaintiff Lena Garrett and her husband, now deceased, owned a tract of land located between I-470 and Wanamaker Road in Topeka. The south edge of the property abutted SW 21st Street. Garrett had a single family residence located on the southern part of the tract, with direct residential access to SW 21st Street.

The City adopted Resolution No. 5587 on January 26, 1988. Resolution No. 5587 affects property in the area known as the Wanamaker Corridor, the area bounded by SW 17th Street on the north, Wanamaker Road on the west, SW 21st Street on the south, and I-470 on the east. Garrett's property was within the Wanamaker Corridor and was affected by Resolution No. 5587. Resolution No. 5587 stated that it was enacted to safeguard public health, safety, and welfare in anticipation of commercial development and to place reasonable controls on traffic flow on the major arterial streets as well as the internal streets within the Wanamaker Corridor. The resolution provided that permanent access to commercial properties and public intersections must be a minimum of

420 feet apart. There would be five permanent access points to the interior traffic circulation for the corridor; the two permanent access points nearest the plaintiff's property were to be north from SW 21st Street, each of which would be a specified distance from Wanamaker Road. Resolution No. 5587 also provided:

"Temporary access to Wanamaker Road and 21st Street may be granted with the following conditions:

a. All temporary access points must comply with existing access standards . . . .

b. Applicant/owner signs written agreement to participate in costs of internal access road.

c. Owner agrees to abandon temporary access at the time the internal access road is available for permanent access to the site."

Each site plan included provisions for continuous internal commercial traffic circulation throughout the Wanamaker Corridor, and one north/south public street would be dedicated and constructed between SW 21st Street and SW 17th Street. The internal traffic circulation plan is known as the "ring road." Although Garrett's property was zoned as residential when Resolution No. 5587 was enacted, the parties agree that the highest and best use of the property was and is for commercial use.

On September 13, 1988, the Topeka City Council adopted and approved Resolution No. 5696 to begin implementing the proposed interior traffic circulation provisions of Resolution No. 5587 by constructing SW Ashworth Place, SW 19th Street Terrace, and SW 20th Park as public streets. The cost would be paid 100% by owners of property within the proposed improvement district, including Garrett's property.

On January 10, 1989, the City adopted a third resolution, No. 5727. The resolution included construction of SW Ashworth Place, extending north from SW 21st Street, and SW 20th Park, an east-west street intersecting SW Ashworth Place. The costs of construction of these roads (except the intersection costs) would be paid 20% by the City and 80% by the improvement district. The costs would be apportioned within the improvement district, with 50% paid by property fronting the improvements and 50% by all lots, tracts, or parcels within the district. Garrett's property was assessed

$144,733.51 for street construction and $33,948.93 for sewer construction for the improvement project related to this resolution.

The construction of SW 20th Park pursuant to Resolution No. 5727 cut through Garrett's tract and created two separate tracts, one of which was bounded on the south by SW 21st Street and on the north by SW 20th Park (south tract) and the other of which was bounded on the south by SW 20th Park (north tract). Garrett's house was on the south tract. In lieu of formal condemnation for the permanent right of way and a temporary easement of 3,713 square feet during the construction of the roadway, Garrett deeded 8,663 square feet to the City for the construction of SW 20th Park in April 1989. She was paid $61,800 as compensation. SW 20th Park and SW Ashworth Place were constructed. At the time this action was filed, SW Ashworth Place extended from SW 21st Street to beyond SW 20th Park, and SW 20th Park intersected SW Ashworth Place and extended to the west a short distance and to the east to just beyond Garrett's eastern property boundary. The streets dead-ended at those points. The only access road to Garrett's property, SW 20th Park, ended "in a corn field" east of her property at the time the action was commenced. (See map on page 901.)

S.W. 17th

N

S.W. Wanamaker

Road

I-470

Proposed Circle Route

S.W. 19th Terr.

Garrett's Property

S.W. 21st

On September 30, 1992, Garrett made written demand on the City to repeal Resolution No. 5587 and grant permanent commercial access to SW 21st Street or complete the ring road project as originally proposed. On January 15, 1993, after the City failed to respond to her demand, Garrett initiated an inverse condemnation action, claiming that by the City's restriction of the permanent commercial access and direct access rights to SW 21st Street and by failing to complete the ring road project, a taking of her property had occurred.

Garrett moved for partial summary judgment. She acknowledged that Resolution No. 5587 advances a legitimate governmental interest and, under Kansas law, rights of access are subject to reasonable regulation under the government's police power. She argued, however, that the resolution had denied her all or substantially all economically viable use of her land. She contended that by failing to complete the ring road, which was designed to offset the access restrictions of Resolution No. 5587, the City's exercise of its police power by the resolution unreasonably restricted commercial access to her property and constituted a taking.

The City filed a cross-motion for summary judgment. Though acknowledging that the ring road had not been completed, the City pointed out that Garrett's right of residential access had not been restricted because Resolution No. 5587 restricts only permanent *commercial* access. The City contended that Resolution No. 5587 was not a taking of property but a valid exercise of police power; further, because reasonable alternate access was provided to the property, no compensable taking had occurred. The City stressed that the portion of the ring road which abutted Garrett's property was complete and asserted that completion of other segments of the ring road was discretionary and not required by Resolution No. 5727. It stated that the fact the ring road had not been completed did not mean the concept had been abandoned. The City admitted that although the value of Garrett's property as commercial property had decreased because of the resolution, it still had economic value. In response, Garrett observed that the highest and best use of the property was commercial, pointed out that she had only temporary direct residential access, and asserted that the value of

her land had decreased because her right to commercial access had been taken by the City's failure to repeal Resolution No. 5587, grant direct commercial access to SW 21st Street, or complete the ring road.

In determining the motion for partial summary judgment, the trial court noted the applicable test that where a landowner's direct access or an access route is changed, the reasonableness of the circuity of travel caused by the rerouting is considered to determine whether the impairment of access to the property is reasonable or unreasonable. The landowner is entitled to compensation for the impairment of his or her access where the rerouting or circuity of travel is unreasonable. See *Small v. Kemp*, 240 Kan. 113, 120, 727 P.2d 904 (1986).

The court noted that the highest and best use of Garrett's property was commercial and concluded that Resolution No. 5587 created a restriction on the direct commercial access to SW 21st Street. The court observed that "the granting of temporary residential access was contingent upon the plaintiff signing a written agreement to participate in the costs of constructing the permanent business access." The court found as a matter of law that a taking had occurred because the rerouting of commercial traffic was unreasonable. In addition, the court pointed out that Garrett no longer had direct access to what was the "front" of her property; rather, the entrance was now "three blocks away" and customers would have to turn in at SW Ashworth Place, turn again at SW 20th Park, and travel one additional block to the entrance of Garrett's property, and the road dead-ended there without turnaround space.

Two months after the court's award of judgment as to the taking, the parties filed pretrial orders agreeing that the date of the taking was January 26, 1988. The City renewed its motion for summary judgment. In its renewed motion, the City argued that in an inverse condemnation action where no property interest is taken, a balancing test weighs the benefit to the public against the burden to the landowner. The City argued that no actual taking occurred and that Resolution No. 5587 substantially advanced the valid public purpose of traffic control and safety and imposed only a potential

future economic burden on commercial development. Though Garrett's property was zoned as residential at the time the court found there was a taking, in its motion the City stated that Garrett's south tract of property was by that time zoned for commercial use, construction of a building for retail sales was planned, and the property had direct access to SW 21st Street through an easement on adjacent commercial property. The City asserted the trial court's prior finding that Garrett's temporary residential access was conditioned on signing a written agreement to participate in the cost of constructing the permanent business access was incorrect. In support of the motion the City submitted the affidavit of the director of the Topeka-Shawnee County Planning Commission, which stated that the "temporary access conditions" provided for in Resolution No. 5587 applied to temporary *commercial* access and did not restrict existing access to developed properties.

The trial court refused to consider this affidavit because it contradicted the uncontroverted statement of facts submitted by the City in its motion for summary judgment. The court's refusal to admit the affidavit was also based on a June 1988 letter memorandum in which James H. Schlegel II, the Director of the Topeka-Shawnee County Metropolitan Planning Commission, reversed his earlier opinion on the effects of the City's policy and stated, in part:

"Initially, a concept plan for the interior frontage road was developed by the Planning Agency Staff. However because of the objections from some of the effected [*sic*]developers, the concept plan was not approved. Both developers and the Planning Commission were of the opinion that the concept plan did not provide for sufficient flexibility. Based upon the proposals presented to date, it is quite evident that a "workable" interior frontage road will not be achieved because of the varying interests involved.

"I would anticipate that with the proposed development of each subsequent smaller property, there will be requests for 'temporary access' points along with SW 21st Street and Wanamaker Road and prior to the actual improvement of the interior frontage road system. The continuity and sequencing of the interior access will be based upon the subsequent rezoning and development of virtually each and every property in this area, therefore extending the completion of the street over an indefinite period of time.

"In as much as I fully support the restriction of access as set forth in Resolution #5587, *I am of the opinion that until such time as the entire interior frontage road*

*system is in place there is less than an equal or balanced benefit to the subject properties and the public resulting from the limited access along the adjacent major thoroughfares.*

"Therefore, I respectfully recommend that serious consideration be given to the acquisition of the right of way through eminent domain and the creation of an improvement or benefit district to establish the interior frontage road system. By way of this process, the City would:

"1) Support the reciprocal benefit issue.

"2) Resolve the question as to timing and sequencing.

"3) Resolve the question as to who pays for the improvement.

"4) Provide the necessary right of way for the orderly extension of water-sewer-storm sewer and other utilities.

"It is my understanding that the Engineering Division is currently developing a preliminary plan for the alignment and design together with an estimate of the project cost. The Planning Agency Staff supports the initiation of this proposal at this time." (Emphasis added.)

The trial court found that Resolution No. 5587 was not a zoning ordinance, nor did it restrict Garrett's use of her property; therefore, the court found that the law concerning police power regulatory use restrictions was not applicable and rejected the City's argument to apply a balancing test. The court affirmed its original judgment finding that Resolution No. 5587 restricted Garrett's access to SW 21st Street, an incident of ownership which cannot be taken for public use without compensation, and failed to provide reasonable rerouting.

The parties then addressed the calculation of damages. The City asserted that future development of the ring road should be considered in calculating damages. It pointed out that Garrett was previously paid $61,800 as compensation for the taking and construction of SW 20th Park and that by that time the south tract of Garrett's property had been developed into commercial property. The City argued that Garrett's acceptance of $61,800 for the construction of SW 20th Park barred her claim for damages from the taking of her right to direct commercial access to SW 21st Street and that awarding additional damages would result in dual compensation.

The court determined that because different issues were involved, the taking due to Resolution No. 5587 and the damage to Garrett's property existed whether or not SW 20th Park was constructed; therefore, payment for that taking would not be included in the calculation of damages.

Following the trial court's determination of the method for calculating damages, the parties stipulated that under that method damages were $190,000. The City reserved its right to appeal the taking judgment and the trial court's method for calculating damages. The trial court entered judgment for Garrett in the amount of $190,000. The City appeals.

## TAKING OF PLAINTIFF'S PROPERTY

The Fifth Amendment to the United States Constitution, applicable to the states via the Fourteenth Amendment, prohibits private property from being taken for public use without just compensation. *Lone Star Industries, Inc. v. Secretary, Kansas Dept. of Transp.*, 234 Kan. 121, 123, 671 P.2d 511 (1983). This prohibition is codified in K.S.A. 26-513(a), which states that private property shall not be taken or damaged for public use without just compensation. The procedure for the government to exercise its power of eminent domain is set forth in K.S.A. 26-501 to 26-516 and is to be followed in all proceedings. K.S.A. 26-501. The exercise of eminent domain is referred to as a condemnation proceeding. "Eminent domain" is the right and power of a governmental entity to take private property for public use without the owner's consent upon payment of just compensation. The requirement of a physical taking has been modified such that where a government has imposed significant restrictions on private property through eminent domain or an exercise of police power, a taking may be found and the government required to pay compensation. *Small v. Kemp*, 240 Kan. at 117.

In addition to exercising the power of eminent domain to acquire land to build highways or streets, a public authority in the exercise of police power may regulate or restrict the use of the streets and highways to the extent necessary to provide for and promote the safety, peace, health, morals, and general welfare of the people.

Where there is an actual taking of property under the police power, compensation is required. If no actual taking of private property occurs, the fact that such regulation results in a diminution of the value of private property does not necessarily require that the landowner be compensated. *Small*, 240 Kan. at 119.

Three types of regulatory takings by use of police power have been recognized: physical, title, and economic. A physical regulatory taking constitutes a per se taking. This category arises when a regulation produces a physical intrusion, occupation, interference, or displacement onto or into a property owner's space sufficient to constitute a per se taking. Examples of this type of regulation include authorization of low and frequent overflights for military airplanes (*United States v. Causby*, 328 U.S. 256, 90 L. Ed. 2d 1206, 66 S. Ct. 1062 [1946]), forbidding an owner to exclude the boating public from a newly navigable pond (*Kaiser Aetna v. United States*, 444 U.S. 164, 62 L. Ed. 2d 332, 100 S. Ct. 383 [1979]), and the authorization of permanent physical occupation of the landowner's property by cable lines and boxes on the roof of apartment buildings (*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 73 L. Ed. 2d 868, 102 S. Ct. 3164 [1982]). Where a government regulation authorizes permanent, physical occupation by parties other than the government, there is a per se taking, and no balancing test is applied.

A title regulatory taking is a restriction on use which significantly interferes with the incidents of ownership. Title takings differ from physical takings in that the regulatory body does not authorize physical invasion of the land but restricts incidents of ownership. See *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992). An example is requiring land dedication as a condition for the issuance of a building permit. See *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 97 L. Ed. 2d 677, 107 S. Ct. 3141 (1987). Although title takings are not subject to a per se rule, heightened scrutiny of the governmental objective is implied.

An economic regulatory taking is a taking only if the economic impact on the landowner outweighs the public purpose of the regulation. Economic takings "comprise the vast majority of regulatory

taking cases." Freilich and Garvin, *Takings after* Lucas: *Growth Management, Planning, and Regulatory Implementation Will Work Better Than Before,* 22 Stetson L. Rev. 409, 417 (1993). Under this category, a two-tier inquiry is made to determine if a compensable taking has occurred. Both the purpose of the regulation and its economic impact on the landowner are considered. This is the arm of the regulatory taking analysis which asks whether the regulation has gone too far in affecting the land's economic value.

Inverse condemnation is an action to obtain compensation for the taking of private property by government which is initiated by the person having interest in the private property rather than by the governmental entity. In a condemnation or inverse condemnation action, the question of whether there has been a compensable taking of property is a question of law for the trial court. See *Hudson v. City of Shawnee,* 246 Kan. 395, 403, 790 P.2d 933 (1990); *Teachers Insurance & Annuity Ass'n of America v. City of Wichita,* 221 Kan. 325, Syl. ¶ 7, 559 P.2d 347 (1977); *Brock v. State Highway Commission,* 195 Kan. 361, 366, 404 P.2d 934 (1965). An appellate court's review of questions of law is unlimited.

In addition to a right to be compensated for property taken by the government, the owner of land abutting a street or highway has a private right to use the property and to access the street or highway, distinct from that of the public, which cannot be taken or materially interfered with by condemnation or an exercise of police power without just compensation. However, the rights of an abutting owner's right to access must be subordinated to the right of the public to the proper use of the highway and the right of governmental agencies to enforce proper regulation. The landowner's rights are subject to reasonable regulations and restrictions for the purpose of providing reasonably safe passage for the public, but the regulations or limitations cannot be enforced without just compensation where they unduly limit or unreasonably interfere with the rights of the abutting property owners. *Brock v. State Highway Commission,* 195 Kan. at 367. A case-by-case approach is used in determining whether the facts and circumstances of a case show free and convenient access or substantial interference with access or impose a burden to the use of the land. The courts

will not interfere with a valid exercise of police power as long as the restriction is reasonable. See 195 Kan. at 368, 371.

The parties disagree as to the applicable test for evaluating whether a compensable taking under Resolution No. 5587 occurred. The City asserts that the trial court erred by applying an eminent domain analysis for an actual taking of the property. The City reasons that because Resolution No. 5587 was adopted pursuant to the City's authority to regulate traffic flow, a regulatory use analysis under its police power applies. The City argues that an economic regulatory taking occurred and that the applicable test to determine whether the taking is compensable is the balancing test, weighing the benefit to the public against the economic burden to the landowner to determine if the City's regulation went too far. According to the City, the economic burden to the landowner occurs only when the regulation denies the landowner all economically viable use of his or her land. The City concludes that (1) Resolution No. 5587 serves the valid public purpose of regulating traffic control and promoting traffic safety; (2) there was no economic burden because there was no deprivation of economically viable use of Garrett's land; and (3) the regulation did not interfere with the existing use (residential) of Garrett's property and affected only future commercial use.

Garrett agrees that a regulation of property under the police power of the City for the purpose of traffic control and public safety is not a per se taking. Garrett's claim is not that her use of the property for commercial development was denied by the City's exercise of its police power but that because the City failed to complete the ring road or repeal the resolution, her lack of commercial access was an unreasonable restriction that decreased the value of her land. She asserts the "regulatory use" analysis set forth by the City is inapplicable because the *use* of her property was not restricted by the resolution. Garrett asserts that the correct test is the one used by the trial court in evaluating whether there was a restriction of access and whether a reasonable alternate route was provided.

We disagree with the trial court's conclusion that the City was not exercising its police power when it enacted the resolutions that

affected the commercial value of the landowner's property. To proceed, we must first determine whether the City's exercise of its police power was a physical, title, or economic taking and then apply the proper balancing test to determine if the City must compensate the landowner for that taking. It is obvious that Resolution No. 5587 was an exercise of police power and not a physical taking. The only physical taking occurred when Garrett deeded a portion of her property for the construction of SW 20th Park; Garrett was compensated for that taking. In addition, the City's exercise of its police power did not deny all economic, beneficial, or productive use of the land. The difficult question is whether the diminution of the value of the landowner's property was a title regulatory taking which significantly interfered with the right of ownership or an economic regulatory taking which affected the value of the land. In some instances the taking may fit within more than one category of takings. After review, we find that this was an economic regulatory taking and that the applicable test is whether the economic impact on the landowner outweighs the public purpose of the regulation.

Where the government's exercise of its police power has an economic impact on private property, a balancing test is applied to determine if the regulation of private land is too unfair or goes too far. Factors that are used in determining if government action is too unfair or goes too far include, but are not limited to, the economic loss, *i.e.*, loss of value of land or sales; restrictions on access; and the distance and circuity of travel that is now required for ingress and egress. Where the use of police power is too unfair or goes too far, the public, not the landowner, must bear the cost. Did the City go too far here? Our prior cases answering somewhat similar questions appear inconsistent.

In *Small v. Kemp*, 240 Kan. 113, the plaintiff claimed that the State had used its power of eminent domain to take his property. The *Small* court reviewed and distinguished the right of eminent domain from the power of the government to constitutionally take or interfere with privately owned property without just compensation when the taking is to promote public health, safety, welfare, and morals under its police power. Plaintiff Small owned an animal

clinic in Overland Park. The clinic originally fronted Grant Circle, which terminated in a cul-de-sac to the south and which intersected with a frontage road to the north. The State relocated the frontage road on land near but not touching the plaintiff's property. Small's clinic was still on Grant Circle, but that road ended in a cul-de-sac at Small's clinic and then continued south, where it intersected with the relocated frontage road. Prior to and after the relocation, the frontage road intersected 75th Street, but after the relocation the intersection was 400 to 600 feet east of the former intersection. With the relocation, the clinic was approached only from the south, and traffic flowed around the south side of the clinic, rather than past the clinic and to the north. The jury, following instructions applicable to eminent domain, awarded Small $50,000 compensation.

The *Small* court recognized that the constitutional prohibition against taking by eminent domain without just compensation creates no barrier to the proper exercise of the government's police power. 240 Kan. at 116-17. The *Small* court noted the State had not taken Small's property but had exercised governmental police power to regulate the use of, or impair a right in, the property to prevent detriment to the public interest, without the payment of compensation. 240 Kan. at 117. Small was not denied access to his property, but rather the mode of access was modified. The *Small*-court determined that the relocation of the frontage road merely diverted traffic, and noted:

"The change of travel route does not of itself result in legal impairment of the right of ingress and egress to and from such property and a controlled access highway. Where a landowner's direct access or an access route is changed, the reasonableness of the circuity of travel caused by the rerouting of the access is considered to determine whether the impairment of access to the property is reasonable or unreasonable. The landowner is entitled to compensation for the impairment of his access where the rerouting (circuity of travel) is unreasonable." 240 Kan. at 120.

All access to and from an existing public highway may not be taken from the owner of land abutting the highway by the public without just compensation. The right of access of an abutting property owner upon a public street or highway is merely a right to

reasonable, but not unlimited, access to and from the abutting property. An owner of land has no right to the continuation of a flow of traffic in front of his property from a controlled access thoroughfare, and under certain circumstances the State may abandon, reroute, or otherwise divert traffic without any liability to the owner of abutting lands. 240 Kan. at 119.

In *Brock*, 195 Kan. 361, the plaintiffs owned property abutting U.S. Highway 24 in Topeka. The businesses located on plaintiffs' property had direct access to the highway. In 1951, the State condemned portions of the plaintiffs' property to widen the highway, and in 1955, the highway was declared to be a controlled access facility (see K.S.A. 68-1901 *et seq.*). In 1956, a frontage road was constructed between plaintiffs' property and the highway, using land which the defendant had acquired by condemnation in 1951 for the widening project. After the frontage road was constructed, the businesses had access to the highway via only two access facilities which the defendant had constructed at each end of the frontage road. The plaintiff brought an action for the loss of direct access to the highway. The defendant answered alleging that the landowner had been furnished reasonable, direct, and convenient access to and from the highway. The jury found for the defendant, and the landowner appealed. The *Brock* court observed that in light of the changes which had occurred in the highway system as a result of the increased number and speed of automobiles, the doctrine granting a right of access to abutting landowners which had developed for conventional streets and highways did not apply in the same manner to controlled access highways. The court reaffirmed the rule that owners of abutting lands have a right of access to the public road system, but the court rejected a requirement of unlimited direct access to and from a controlled access thoroughfare. "The right of access, if it can be determined to be a right under such circumstances, is the right to reasonable, but not unlimited, access to and from the abutting lands." 195 Kan. at 370. Pursuant to the police power of the State and in the interest of public safety, the *Brock* court concluded that no unreasonable restriction of access had occurred. The court also noted that the frontage road was itself a part of the highway system and the plain-

tiffs had unlimited access to the frontage road. "Access is not denied but traffic is regulated within the scope of the police power of the state." 195 Kan. at 371.

A similar conclusion was reached in *Ray v. State Highway Commission*, 196 Kan. 13, 410 P.2d 278, *cert. denied* 385 U.S. 820 (1966). There, a highway abutting the plaintiffs' property was turned into a divided, concrete four-lane highway with a frontage road. The plaintiffs had access to the frontage road from all points of their property. There were two points of connection between the frontage road and the westbound traffic on the highway; one was 155 feet east of the east boundary of the plaintiff's property, and the other was 714 feet west of the west boundary of the property. 196 Kan. at 15. The landowners filed an action claiming that the defendant's exercise of police power had impaired their right of access. Applying the same analysis as the *Brock* court, the *Ray* court found the access to be reasonable.

In other cases the government's exercise of police power which changed the access to private property was found to be unreasonable. In *Teachers Insurance & Annuity Ass'n of America v. City of Wichita*, 221 Kan. 325, 559 P.2d 347 (1977), the landowners had direct access to Kellogg Street (a major trafficway) and a side street. The State Highway Commission then changed Kellogg Street to a fully controlled access facility. With the change, the plaintiffs would not have direct access to the new highway. An access road would be constructed, but that road would not have direct access to the highway either. To reach the plaintiffs' property, persons travelling on the highway would have had to travel from 1.34 to 2 miles, possibly by means of a "tortuous and circuitous route." 221 Kan. at 328. Recognizing that the State, subject to constitutional limitations, has absolute control over streets and highways, either by the use of its police power or by the power of eminent domain, the *Teachers Insurance* court also pointed out that the right of access to and from an existing public street or highway is one of the incidents of ownership of the land abutting the street or highway. 221 Kan. at 330. The *Teachers Insurance* court concluded that access is the right vested in the owner of land which adjoins a road or other highway to go and return from his or her own land

to the road or highway without unreasonable interference. 221 Kan. at 335. Because there had been a substantial impairment of and an unreasonable interference with the plaintiffs' right of access to the highway, this court found that a compensable taking had occurred. 221 Kan. at 336.

In *McCall Service Stations, Inc. v. City of Overland Park*, 215 Kan. 390, 524 P.2d 1165 (1974), the landowner operated a service station which fronted and had direct access to a highway and a street. Because of changes to the intersection of the street and highway, the access points to the service station were changed. McCall filed an action claiming that the right of access had been substantially impaired by the City's exercise of its police power. To show that the change of access had diminished the value of the land, McCall introduced evidence of reduced sales each month since the taking. The district court found there had been a taking and awarded compensation to the landowner. The City appealed. The *McCall* court distinguished *Brock* as involving a controlled access highway and found that a compensable taking had occurred. 215 Kan. at 394-97. The *McCall* court approved the use of loss of sales to show a decrease in market value and noted that (1) the market value was decreased by the change in access and (2) there was no testimony that the taking of access was to protect the public. The *McCall* court affirmed the trial court. 215 Kan. at 397.

Garrett makes a similar claim. Garrett argues that in addition to substantially and unreasonably interfering with her right of access to SW 21st Street, by failing to complete the ring road as contemplated by the original resolution, the City substantially reduced the commercial value of Garrett's property.

In *Kohn Enterprises, Inc. v. City of Overland Park*, 221 Kan. 230, 559 P.2d 771 (1977), the landowner operated a motel and restaurant which fronted and had direct access to a highway and a street across from the property in *McCall*. Because of changes to the intersection of the street and highway, the access points were moved. There was a loss of security because there was no longer a view from the motel office of persons entering the premises, and there was also a loss of privacy for motel facilities. Further, access from the highway was severely restricted. The district court found

that a compensable taking had occurred. Although there was evidence relating to safe traffic regulations in *Kohn*, the *Kohn* court followed the holding in *McCall*, found that the Kohn property had sustained the same type of access loss as in *McCall*, and held that the taking was compensable. *Kohn*, 221 Kan. at 236.

These cases provide a framework for evaluating Garrett's claim that the City's exercise of its police power constituted an unreasonable change to her access to SW 21st Street and that its failure to complete the ring road diminished the economic value of the land. Although some of the cases involved controlled access facilities or highways, the cases all apply the same test and evaluate whether the alternate access is "reasonable." Because of the increased number and speed of automobiles on highways, this court has been less likely to find that alternate access to a controlled access facility is unreasonable. See *Brock*, 195 Kan. at 369. However, even when access to a controlled access facility is at issue, a rerouting of 1.34 to 2 miles was found to be unreasonable. *Teachers Insurance*, 221 Kan. 325. Reconciling the rationale of the cases discussed to state a broad rule, it appears that use of police power which restricts access to a street, highway, or a controlled access commercial area may be compensable depending on the reasonableness of the alternate access. Where a controlled access highway is constructed, public safety concerns allow a greater rerouting or diversion of access. Here, the parties agree that the rationale behind Resolution No. 5587 was to control traffic flow to and from SW 21st Street as well as the commercial traffic on surrounding streets and commercial traffic within the corridor.

We also note that in *Small*, this court considered whether to adopt a rule that the landowner is entitled to compensation where the diversion of traffic results in a cul-de-sac. This court rejected a per se rule because Small's clinic was located in a cul-de-sac prior to the relocation of the frontage road. However, the fact that a relocation of a street results in a cul-de-sac and takes away a landowner's direct access to the street is a factor to consider in determining whether the rerouting is reasonable.

Here, unlike in *Small* and the other cases previously discussed as to compensation for loss of access, the City not only limited

Garrett's access to SW 21st Street, it also failed to complete the ring road and in failing to do so diminished the commercial value of her property. Since this was an economic taking, the applicable test is weighing the public benefit against the economic burden to the landowner.

The trial judge determined that because the City had failed to complete the ring road, which would have provided additional access points for commercial traffic to SW 17th Street, Wanamaker Road, and SW 21st Street, restricting direct commercial access from Garrett's property to SW 21st Street and placing the commercial property on a cul-de-sac was not a reasonable rerouting. It found that the alternate access decreased the economic value of the property and that under the circumstances, the City must bear the economic loss to the landowner's property.

The takings clause of the federal Constitution's Fifth Amendment is violated when land-use regulation does not substantially advance legitimate State interests or denies an owner economically viable use of his or her land. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1016, 120 L. Ed. 2d 798, 813, 112 S. Ct. 2886 (1992). The takings clause applies to regulation of property as well as to physical deprivation of property. 505 U.S. at 1028 n.15. Where the government reasonably concludes that the health, safety, morals, or general welfare would be promoted by prohibiting particular contemplated uses of land, compensation need not accompany a reasonable prohibition. 505 U.S. at 1023; *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 125, 57 L. Ed. 2d 631, 98 S. Ct. 2646 (1977).

The public safety rationale of Resolution No. 5587 was to decrease the number of avenues of direct access to SW 21st Street because of commercial development. In addition, that resolution also was enacted to control commercial traffic off the public streets within the corridor. To construct SW Ashworth Place, extending north from SW 21st Street and SW 20th Park, Garrett's property was assessed approximately $144,000 for street construction and $33,950 for sewer improvements. Because of the reduced access to Garrett's property and the failure to complete the ring road for

interior traffic, the value of Garrett's land as commercial property has decreased.

Did the City act reasonably in this case? To resolve that question we apply the balancing test to determine if the landowner or the City at large is to bear the economic loss to the property caused by the City's exercise of its police power. In applying this test we are able to use the findings of the district court. Based on the findings of the district court, we find that the economic impact of the resolutions interfered with the landowner's investment and caused an economic loss which should be borne by the City.

## BAR TO COMPENSATION

The City argues that Garrett's acceptance of $61,800 for the construction of SW 20th Park barred her claim for damages from the taking of her right to direct commercial access to SW 21st Street because the access restriction resulting from the failure to complete the ring road included the restricted access through SW 20th Park. The City concludes that Garrett had already been compensated. The City contended that the district court's award to the landowner results in duplicate compensation to Garrett. The trial court rejected this argument.

The rules governing calculation of damages in a condemnation proceeding, found at K.S.A. 26-513, apply to calculating damages in inverse condemnation proceedings as well. Where only a part of a tract of land is taken, damages are the difference between the value of the entire property before the taking and the value of that portion of the tract remaining after the taking. On appeal, the City acknowledges that if after applying the balancing test, this court finds that the City has gone too far, this "before and after" rule applies in determining the damages.

The City asserts that factors to be considered include the most advantageous use to which the property is reasonably adaptable, access to the property remaining, and severance or division of a tract. K.S.A. 26-513(d)(1), (2), (6). The City reasons that because all damages resulting from a taking are assessed in one proceeding, these factors were previously considered in calculating the $61,800 compensation paid Garrett for the construction of SW 20th Park.

As authority, the City cites *DeVore v. State Highway Comm.*, 143 Kan. 470, 54 P.2d 971 (1936).

In *DeVore*, this court recognized that when a deed is given in lieu of condemnation, the deed grants the same rights acquired by a condemnation action. The compensation for the action includes the compensation for the value of the land taken and the damage to the land not taken. 143 Kan. at 473. In *DeVore*, rather than filing a condemnation action, the Highway Commission purchased a right-of-way from the landowners. Subsequently, the commission commenced a condemnation action for additional acreage. When the landowner sought to include flooding as part of the damages in the condemnation action, the trial court excluded the evidence because the flood damages resulted from the original taking and not from the subsequent condemnation. This court agreed and concluded: " 'The conveyance of land for a public purpose . . . will be held to be a release of all damages which would be presumed to be included in the award of damages if the property had been condemned.' " 143 Kan. at 473. The City cites cases from other jurisdictions reaching similar conclusions.

The rule stated in *DeVore* is correct, but it is inapplicable here. Garrett received compensation in lieu of condemnation for the construction of SW 20th Park pursuant to Resolution No. 5727, not pursuant to Resolution No. 5587. The compensation could reasonably be presumed to have included damages for the value of the land taken, for the severance of Garrett's land into two tracts, and for the restriction of direct access from the north tract to SW 21st Street. The construction of SW 20th Park did not require any restriction on direct access, commercial or otherwise, to SW 21st Street from the south tract of Garrett's property. Therefore, the loss of direct access from the south tract was not a part of the damages contemplated when Garrett received compensation for the construction of SW 20th Park. The trial court correctly held that the $61,800 Garrett received in lieu of condemnation was not a complete bar to compensation for the taking of direct commercial access to SW 21st Street in this action.

## DAMAGES

Damages in an inverse condemnation action are calculated pursuant to K.S.A. 26-513. Where, as here, a partial taking of property

has occurred, the measure of damages is the difference between the value of the entire property immediately before the taking and the value of that portion of the property remaining immediately after the taking. See K.S.A. 26-513(c). The statute specifies factors which are considered in calculating the amount of damages. K.S.A. 26-513(d). Those factors include access to the property remaining and severance or division of property. The parties agree that the date of the taking was January 26, 1988, the date the City adopted Resolution No. 5587.

The City argued to the trial court that if the compensation Garrett received for the construction of SW 20th Park did not bar her claim for compensation for the restricted access to SW 21st Street, then the prior compensation affected the calculation of damages resulting from the restricted access. It argued that the compensation for damages resulting from the construction of SW 20th Park and the severance of Garrett's land should be deducted from the calculation of damages resulting from the adoption of Resolution No. 5587, restricting Garrett's direct commercial access to SW 21st Street. The trial court disagreed and found that the taking of Garrett's land to construct SW 20th Park did not sever direct commercial access to the property. The court concluded that "the prior compensation is not part of, nor should it be part of any calculation in the current suit."

Garrett points out that the parties filed a stipulation as to just compensation, agreeing that her damages were $190,000. Garrett argues that this stipulation bars the City's appeal on the damage verdict. The City points out that it was only after the trial court held that the prior compensation had no impact on the current damages that it entered into the stipulation. If the trial court incorrectly excluded consideration of the prior compensation in determining the damages in the current case, the City could properly appeal the trial court's exclusion of the prior compensation from consideration.

The difficulty in determining damages here arises from the fact that Resolution No. 5587 was adopted prior to the construction of SW 20th Park, but this action was not filed until after Garrett received compensation for the construction of SW 20th Park. Im-

mediately before Resolution No. 5587 was adopted, Garrett had one contiguous tract of land fronting and with direct access to SW 21st Street. Thus, when Resolution No. 5587 restricted Garrett's direct commercial access to that street, all parts of Garrett's tract were affected. Garrett's property was not severed by that taking. However, Garrett's property was severed into two tracts as a result of the City's adoption of Resolution No. 5727. Garrett received compensation for this severance when she agreed to compensation in lieu of condemnation. This compensation occurred after the date of the taking by Resolution No. 5587 but before damages for the Resolution No. 5587 taking were calculated.

The appraisal submitted by Garrett valued the property immediately before the adoption of Resolution No. 5587 at $430,000; this property was described as being 115,004 square feet with 124 feet fronting SW 21st Street. To calculate the value immediately after the taking, the appraiser assumed that SW 20th Park was the only access to SW 21st Street for both portions of the property. The appraiser found that the front tract contained 30,942 square feet and the rear tract contained 75,487 square feet (a total of 106,429 square feet) and that the value was $206,000, a difference of $224,000. Thus, the appraiser considered that the result of the Resolution No. 5587 taking was the severance of Garrett's property and the loss of the area taken for the construction of SW 20th Park. However, the appraiser did state that these estimates did not take into account the amount paid for the right-of-way purchased from Garrett for the construction of SW 20th Park.

We note that in *Hudson v. City of Shawnee*, 246 Kan. 395,406, 790 P.2d 933 (1990), the court discussed the effect that one construction project has on the calculation of loss of value damages for another construction project, depending on whether the two projects are related or unrelated. A party asserting that two or more projects should be considered as one for valuation of property taken has the burden of proving that the projects are related.

The parties agreed to compensation of $190,000, although, applying the appraiser's calculations, the decrease in property value was $224,000. By agreeing to the lesser amount of compensation, it appears that the parties recognized that the appraiser's calcula-

tions would result in dual compensation for the acreage taken for construction of SW 20th Park. The City is bound by its stipulation that the amount of compensation should be $190,000.

Affirmed.

McFARLAND, C.J., dissenting: First, it is necessary to determine what is, and what is not, involved in this case. The majority concludes that an "economic regulatory taking has occurred." This is not a regulatory taking case.

A regulatory taking may occur if a governmental body unreasonably regulates the use a landowner may make of his or her land. The majority cites Freilich and Garvin, *Takings after* Lucas: *Growth Management, Planning, and Regulatory Implementation Will Work Better Than Before*, 22 Stetson L. Rev. 409 (1993), in support of its holding that an economic regulatory taking has occurred. However, the law review article clearly demonstrates that regulatory taking cases involve governmental regulation of the actual use a landowner may make of the subject land.

As the article notes, there are three types of regulatory takings: physical, title, and economic. A physical taking, sometimes referred to as a "possessory" or "trespassory" taking, occurs when the regulatory action authorizes physical intrusion upon the land. The law review article cites two examples of such a taking: *Kaiser Aetna v. United States*, 444 U.S. 164, 62 L. Ed. 2d 332, 100 S. Ct. 383 (1979), involving making a privately owned lagoon accessible for navigable water and public use; and *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 73 L. Ed. 2d 868, 102 S. Ct. 3164 (1982), which involved a New York statute allowing a cable TV company to permanently install equipment on privately owned property. A title regulatory taking involves the governmental body demanding development exaction from the landowner as a condition to allowing the landowner's proposed development, such is the case in *Nollan v. California Coastal Comm'n* , 483 U.S. 825, 97 L. Ed. 2d 677, 107 S. Ct. 3141 (1989), wherein the landowners had to grant the public an easement to use their beach in exchange for obtaining a permit to replace their small beachfront bungalow with a larger house.

These two categories have been discussed briefly to show they always involve the actual use of the land, as does the third category of regulatory taking, economic, found to exist herein by the majority. Economic regulatory taking is discussed at great length in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992).

In *Lucas*, the regulation at issue barred the landowner from erecting any permanent habitable structure on land that had been purchased on a South Carolina barrier island for the purpose of building single-family homes. This regulation was held to deprive the landowner of all "economically viable use" of his property and thus constituted a governmental taking. 505 U.S. at 1016. Economic regulation cases essentially are zoning or zoning equivalent cases and generally hold that no compensable taking has occurred unless all economically viable use of the property has been precluded.

A treatise could be written on *Lucas* and its aftermath. However, there is little point in doing so as no regulatory taking of any flavor is involved herein. The subject property's highest and best use, at all pertinent times, is commercial, and no governmental regulation precludes such use or is claimed to preclude such use.

That regulatory taking applies to regulation of the use of the land is consistent with our prior case law. See *Jack v. City of Olathe*, 245 Kan. 458, 781 P.2d 1069 (1989) (zoning action denying expansion of present use not compensable); *Kimberlin v. City of Topeka*, 238 Kan. 299, 305-06, 710 P.2d 682 (1985) (restrictions on usage of particular property must be reasonable; reduction in value by itself does not amount to a taking); *Houston v. Board of City Commissioners*, 218 Kan. 323, 332-33, 543 P.2d 1010 (1975) (existing uses protected; any diminution in value of property as result of ordinance immaterial).

This case involves only a restriction of access to an abutting street, an area that has its own well-developed case law. This is not a regulatory taking case, and such law is inapplicable herein.

Southwest 21st Street was improved and widened by the defendant City under its police power. There is no claim that this was not a valid exercise of the defendant City's police power. The ques-

tion is whether the alteration of access to the street relative to plaintiff's property is reasonable.

In *Small v. Kemp*, 240 Kan. 113, 727 P.2d 904 (1986), we set out the basic rules concerning taking and restricted access. There, we recognized the rule that a landowner whose land adjoins an existing road or highway has a vested right to access his or her property (and for customers to access the property) without unreasonable interference. However, we also recognized that the right of access is not unlimited.

"Access to and from an existing public highway may not be taken from the owner of land abutting the highway by the public without just compensation. The right of access of an abutting property owner upon a public street or highway is merely a right to reasonable, but not unlimited, access to and from the abutting property. [Citation omitted.] An owner of land has no right to the continuation of a flow of traffic in front of his [or her] property from an access-controlled thoroughfare and the State may abandon, reroute, or otherwise divert traffic without any liability to the owner of abutting lands. [Citation omitted.]" 240 Kan. at 119.

"The change of travel route does not of itself result in legal impairment of the right of ingress and egress to and from such property and a controlled access highway. Where a landowner's direct access or an access route is changed, the reasonableness of the circuity of travel caused by the rerouting of the access is considered to determine whether the impairment of access to the property is reasonable or unreasonable. The landowner is entitled to compensation for the impairment of his [or her] access where the rerouting (circuity of travel) is unreasonable." 240 Kan. at 120.

We use a case-by-case approach in determining whether the restricted access is reasonable. Courts will not interfere with a valid exercise of police power as long as the restriction is reasonable. See *Brock v. State Highway Commission*, 195 Kan. 361, 371, 404 P.2d 934 (1965).

In *Small*, we found that the government's rerouting of an access route was reasonable. There, the plaintiff owned an animal clinic situated on Grant Circle which terminated in a cul-de-sac at one end and intersected with a frontage road at the other. The State relocated the frontage road to the cul-de-sac side of Grant Circle and, as a result, traffic was diverted to the south of the clinic rather than past the clinic. We held that, under the facts of that case, the landowner was not denied total access to his property; rather, the

mode of access was slightly modified. Thus, the relocation of the frontage road did not impose an unreasonable change in access, and no compensable taking occurred. 240 Kan. at 120.

We also found the rerouting reasonable in *Brock*, 195 Kan. 361. There, the plaintiffs' property, on which stood four business establishments, abutted U.S. Highway 24 in Topeka, and plaintiffs had direct access to that highway. Eventually, with the construction of a frontage road between the plaintiffs' property and the highway, future access was to be available only at designated points, *i.e.*, at each end of the 575-foot frontage. As a consequence, the plaintiffs lost direct access to the highway and brought an action for compensation. On appeal, we reaffirmed the rule which states that although owners have a right to access adjoining roads, there is no requirement that the access be direct and unlimited. We stated that "[i]f the owner has a free and convenient access to his property and to his improvements thereon, and his means of ingress and egress are not substantially interfered with by the public, he has sustained no compensable loss." 195 Kan. at 367-68. We found no compensable taking in *Brock*, as the frontage road was part of the highway system and the plaintiffs had unlimited access to the frontage road. 195 Kan. at 370-71.

Finally, in *Ray v. State Highway Commission*, 196 Kan. 13, 410 P.2d 278, *cert. denied* 385 U.S. 820 (1966), we found the rerouting reasonable where a frontage road limited direct access to the plaintiffs' property. There were two points of access from the frontage road to the property in question: One was approximately 155 feet east of the east boundary and the other was 714 west of the west boundary. These access points were 1,067.44 feet apart. We found no unreasonable impairment of access. 196 Kan. at 19-20.

On the other end of the "reasonableness" scale, in *Teachers Insurance & Annuity Ass'n of America v. City of Wichita*, 221 Kan. 325, 559 P.2d 347 (1977), we determined that some circuitous rerouting is unreasonable and, therefore, must be compensated. There, the landowners initially had direct access to Kellogg Street in Wichita, a major trafficway. Once Kellogg Street became a fully controlled access facility, the plaintiffs only had access to the newly constructed frontage road. In order to reach plaintiffs' property,

persons traveling on Kellogg would have to travel from 1.34 to 2 miles, "by means of a tortuous and circuitous route." 221 Kan. at 328. Again, we recognized the general rule that abutting landowners have a right of reasonable access to and from an existing public street or highway. However, in that case, because there had been a substantial impairment of and an unreasonable interference with the plaintiffs' right of access to the highway, we found that a compensable taking had occurred. 221 Kan. at 333-36.

To aid in visualizing just how minimal the modification of plaintiff's access is, I attach a map.

Here, by the trial court's characterization, persons entering plaintiff's property from SW 21st Street would have to turn at SW Ashworth Place, turn again at SW 20th Park and travel "one additional block" to plaintiff's property. This "one additional block" is a short one. The distance from the center of SW Ashworth Place to the west edge of plaintiff's property is 100 feet. Although SW 20th Park dead ends east of plaintiff's property, plaintiff has access to SW 20th Park along any point of her abutting property. Plaintiff's access from SW 21st Street to the northern parcel of her property, when measured by distance alone, has barely been changed. Plaintiff's access has only been moved 100 feet to the west. Plaintiff's property has only a 123.75-foot frontage on SW 21st Street. The modified access relieved the plaintiff from having to utilize any of the narrow southern frontage strip for a roadway to the larger northern portion of the property. Plaintiff has unrestricted access to SW 20th Park at any point along the abutting portion of her property. The south parcel of plaintiff's property has now been commercially developed with an easement on the neighboring property, giving the business nearly direct access to SW 21st Street. The majority places much emphasis on the City's failure to complete the ring road. Looking at the modified access in place has to be the court's area of focus. Is it reasonable or unreasonable?

The rerouting of access hardly compares to the unreasonable 1.34- to 2-mile "tortuous and circuitous" route found compensable in *Teachers Insurance*. The reroutings found reasonable in *Brock* (access at each end of the 575-foot frontage), in *Small* (traffic di-

verted to the south of rather than past the clinic), and in *Ray* (access points 155 feet from one boundary and 714 feet from other boundary) are far more severe than the rerouting before us. If the minimal rerouting of access herein is a compensable taking, then virtually any rerouting is compensable—notwithstanding our prior case law to the contrary.

Kansas law, as it existed prior to this case, requires us simply to evaluate the reasonableness of any rerouting resulting from the valid exercise of this police power. I would hold that the rerouting of access to plaintiff's property is reasonable. Consequently, I would reverse the trial court's decision and deny compensation.

Six, J., joins the foregoing dissent.