No. 79,994

CHARLES B. EBERTH, *et al., Appellants,* v. E. DEAN CARLSON, Secretary of the Kansas Department of Transportation, and CITY OF LANSING, KANSAS, *Appellees.*

(971 P.2d 1182)

Opinion filed January 29, 1999.

*Robert E. James,* of Payne & Jones, Chartered, of Overland Park, argued the cause, and *Keith Martin,* of the same firm, was with him on the briefs for appellants.

*Timothy P. Orrick,* of Parkinson, Foth, & Orrick, L.L.P., of Lenexa, argued the cause, *Mike Rees,* chief counsel of the Kansas Department of Transportation, of Topeka, and *Terry Lober,* of Davis, Beall, McGuire & Thompson, of Leavenworth, were with him on the brief for appellees.

The opinion of the court was delivered by

LARSON, J.: This inverse condemnation case requires us to consider the application of *Garrett v. City of Topeka,* 259 Kan. 896, 916 P.2d 21 (1996), to the elimination of an existing highway crossover. This action is clearly not a compensable taking under our recent decisions in *Pringle v. City of Wichita,* 22 Kan. App. 2d 297, 917 P.2d 1351 (1996), and *Hales v. City of Kansas City,* 248 Kan. 181, 804 P.2d 347 (1991).

The question of whether a compensable taking occurred requires us to set forth the largely uncontroverted facts, show how the correct result is preordained by existing Kansas decisions, and then consider if additional evidence or findings or a different result is required by the *Garrett* decision.

Facts

Members of the Eberth family (Ed and his wife, Theresa; Charles and his wife Susan; and Robert) own approximately 82 acres in Leavenworth County located adjacent to and east of Highway K-7 and south of Gilman Road. The City of Lansing (City) owns a tract of approximately 15 acres at the immediate southeast corner of K-7 and Gilman Road. The Eberth tracts are not within the Lansing city limits, but a real estate development known as the Rock Creek Addition located immediately west of the Eberth tracts and K-7 is within the city limits of Lansing.

The Eberths' property is divided approximately in thirds, with Ed and Theresa Eberth owning the north tract, Robert Eberth the central tract, and Charles and Susan Eberth the most southerly tract. The Ed Eberth tract has access to Gilman Road but not to K-7 because of the City tract. The Robert Eberth tract has K-7 frontage, but no access because of Rock Creek, a deep, wide ditch that runs between this tract and K-7. The Charles Eberth tract has K-7 frontage and a road allowing direct northbound access to K-

7. A crossover existed that allowed direct access to K-7 southbound lanes.

Although no formal easement exists, members of the Eberth family have access to K-7 by a series of gravel roads within their property. The Eberth crossover has been in existence since K-7 was expanded into a four-lane highway divided by a grass median.

The City proposed to the Kansas Department of Transportation (KDOT) that a crossover was necessary to service the Rock Creek subdivision. The justification for the new crossover was that traffic exiting the subdivision and intending to travel north on K-7 had to travel south approximately 400 feet to the Eberth crossover. Given the speed of K-7 traffic and the safety danger this maneuver created, particularly for school buses, the City contended the Rock Creek crossover was necessary. The intended Rock Creek crossover would provide access to both north and southbound K-7 lanes.

KDOT undertook a traffic study of the proposed project. The study concluded that in order to safely install a crossover at the exit of the Rock Creek subdivision, a deceleration lane was necessary for northbound traffic, which would run beyond the existing Eberth crossover and require its elimination.

In response to this plan, the Eberths sought an injunction to stop the construction, contending the removal of their crossover eliminated direct access to and from the K-7 southbound lanes. KDOT moved to dismiss the plaintiffs' requested injunction, and the trial court granted the motion. The trial court did hold that the Eberths had presented an inverse condemnation claim and that an evidentiary hearing was necessary.

At the evidentiary hearing, the following evidence was presented:

1. Prior to the construction project, a median break existed on K-7 directly west of the driveway from the Charles Eberth property. This allowed the Eberths and their guests to enter and exit both the K-7 north and southbound lanes.

2. At K-7 and Gilman Road, an open intersection exists which allows free turning movements for all directions of travel on both K-7 and Gilman Road. Gilman Road is less than ½ mile from the

Eberth crossover, and the Eberth properties may access Gilman Road via gravel roads running across and through the three tracts.

3. The Rock Creek crossover is 385 feet north of the Eberth crossover, directly west of K-7 and the Robert Eberth tract. Moving the existing Eberth driveway north to connect with the Rock Creek crossover would cost approximately $221,000 to construct a bridge because of the deep gully separating the Robert Eberth tract from K-7.

4. KDOT's expert testified the highest and best use of the Eberth property is for residential development. Plaintiff's expert testified the highest and best use changed from residential to agricultural with the elimination of the Eberth crossover.

5. Plaintiffs' expert testified the diminution in value of the entire 82 acres of Eberth property is $70,000 due to the elimination of the Eberth crossover and the ensuing lack of direct access to K-7.

6. KDOT's expert testified that there was no diminution in value to the Eberth property caused by the elimination of the Eberth crossover.

7. Evidence was presented as to the enhancement of safety and the servicing of a larger amount of vehicular traffic from the Rock Creek subdivision by the change in the crossover.

8. After the construction of the Rock Creek crossover, vehicles entering K-7 from the Eberth access road would be able to traverse in a northerly direction without change but southbound traffic would be required to drive 385 feet north before making a U-turn and entering the southbound lane of K-7. Prior to the change they were able to travel southbound on K-7 by making a left turn at the Eberth crossover.

Throughout the hearing, the trial court heard arguments as to whether the *Garrett* balancing test was required when a city's actions regulate the traffic flow. KDOT and the City vigorously argued that the hearing was unnecessary and that prior case law controlled because no access had been taken as a matter of law. The Eberths argued the change in the highway denied them their direct access rights to the K-7 southbound lanes and, thus, application of the *Garrett* balancing test was required.

The trial court ruled the case involved a regulation of traffic flow and not a denial of access. The trial court recognized that prior to *Garrett*, KDOT's actions of removing this crossover would have been viewed as a noncompensable regulation of traffic, but noted that *Garrett* appeared to have changed the traditional rules and is applicable to this set of facts. The trial court surmised:

"Perhaps what the *Garrett* decision does is cast these not as a question of access versus traffic flow regulation cases, it's looking at this whole area in terms of—in a more general picture, something that's not just tied to regulation of highways and roads but to the regulatory power of the governmental bodies that affects the use of private property. And that's the analysis that seems to appear in this case that hasn't appeared in prior cases that have been applied to these kinds of questions.

"And that applying that economic regulatory analysis . . . to this type of case has created some uncertainty in my mind about whether in every instance where you have some regulation of traffic, whether the Supreme Court is saying you have to have some kind of an inquiry [and] balancing [test] approach, there's certain language in the opinion that leads me to that conclusion, but I'm not sure that that's what they intended."

The trial court cited as particularly troubling that portion of the *Garrett* opinion that stated:

"Where the government's exercise of its police power has an economic impact on private property, a balancing test is applied to determine if the regulation of private land is too unfair or goes too far." *Garrett*, 259 Kan. at 910.

In interpreting this language of *Garrett*, the trial court stated:

"Now, that would seem to encompass access cases and what you characterize as not access cases as well, so long as there's some showing that it regulates—its public regulation of that has an effect on the economic impact rather than on private land."

Ultimately, the trial court found that the regulation must be considered an economic regulation of private property, triggering the necessity of a *Garrett* balancing test analysis, but clearly held:

1. There was no taking in this case.
2. The regulation did not go too far.
3. The regulation was not so unfair as to make the regulation a compensable taking.
4. Specifically, if *Garrett* applies, this was not a regulatory taking that was compensable because there was a significant and legitimate public safety purpose, and

the economic impact of the regulation upon the present use was not a significant factor affecting the value of the property.

The Eberths appeal.

Analysis

*The issue is whether a compensable taking occurred when an existing crossover was eliminated, which had provided direct access to the Eberths' property. We hold it did not.*

The standard of review in an inverse condemnation case (an action initiated by a properly owner to obtain compensation for the taking of or placing restrictions on private property by a governmental entity) is whether there has been a compensable taking of the property which is a question of law. See *Ray v. State Highway Commission,* 196 Kan. 13, 15, 410 P.2d 278, *cert. denied* 385 U.S. 820 (1966). An appellate court's review of questions of law is unlimited.

The Eberths contend the issue before the court is solely whether an economic taking occurred because the impact on the landowner outweighed the public interest. This contention is centered on our *Garrett* opinion where a balancing test was required to compare the economic impact to the public purpose.

KDOT contends the action in eliminating the Eberth crossover should be viewed as "a regulation of traffic flow" and one that has been accomplished "in the interest of public safety." KDOT argues this is not a "denial of direct access" to and from the Eberths' property. KDOT points to the 1991 *Hales* decision and the more recent 1996 *Pringle* decision, asserting both cases support the proposition that a governmental unit may exercise its police power to limit and regulate traffic without such actions constituting a compensable taking. KDOT states that if direct access was not denied to the Eberths and KDOT's actions were a reasonable regulation of K-7 traffic flow, the *Garrett* balancing test is not applicable.

The Eberths argue this issue is not properly before us because KDOT did not file a cross-appeal to the trial court's consideration of the balancing test. This is not a new issue required to be raised by cross-appeal, for the application of *Garrett* was fundamental and directly involved with both parties' arguments of the legal issues.

While we rely principally on the *Hales* and *Pringle* cases in deciding this appeal, we first look to the statements from 2A Nichols on Eminent Domain, § 6.10[3][a] (rev. 3d ed. 1998), relating to medians, where it is stated: "It is uniformly acknowledged that the placement of a median, median strip, or medial area is a proper exercise of the police power and does not constitute a compensable taking under the power of eminent domain." (Citing cases from 27 jurisdictions.)

Nichols quoted from the Idaho case of *State ex rel. Moore v. Bastian*, 97 Idaho 444, 447, 546 P.2d 399 (1976), as follows:

> " 'Courts have traditionally recognized that governmental acts primarily concerned with public safety and arbitration of social conflict are entitled to great weight in that scale. While it is true that defendants have a property interest in access to public streets, . . . nevertheless not all impairments of that right by the State are compensable or per se unreasonable. . . . That right of access does not encompass a right to any particular pattern of traffic flow or a right of direct access to or from both directions of traffic and we find no compensable impairment of access here. All who wish to reach defendants' property could do so with relatively minor inconvenience.' "

This statement as to reaching property with relatively minor inconvenience is directly applicable to the facts in our case.

Nichols goes on to state: "In Michigan, the rule is simply that 'diversion of traffic is not an element of damages in condemnation proceedings.' " *Biff's Grills, Inc., v. State Highway Comm.,* 75 Mich. App. 154, 158, 254 N.W.2d 824 (1977), and

> "The North Carolina Supreme Court has further held that the construction of a median strip so as to limit a landowner's ingress and egress to lanes for southbound travel when he formerly had direct access to both the north and southbound lanes was a valid traffic regulation adopted by the Highway Commission in the exercise of the police power vested in it by the statutes. *Barnes v. Highway Commission*, 257 N.C. 507, 126 S.E.2d 732 (1962)."

More recent decisions in Kansas are more authoritative and covered substantially similar factual situations to those we face here.

In *Hales*, an abutting landowner sought damages for claimed diminution in value to his property arising out of the City of Kansas City's installation of a median which prohibited some turning movements in and out of an apartment complex. We held that

regulation of traffic was a valid exercise of the police power of the City and because no landowner has the right to an unrestricted flow of traffic, the installation of the median was not compensable. In reaching our decision, Justice Abbott, speaking for a unanimous court, stated:

"Here, it is important to recognize we are not dealing with a denial of access because of a condemnation action or even a limitation of access . . . . The City simply has limited the general public's ability to make a left turn in the area of the landowners' south parking lot. We view this issue the same as we would if The City had decided to prohibit left turns at this area." 248 Kan. at 183.

We relied on the text and cases from Nichols cited above, and referenced *McCall Service Stations, Inc. v. City of Overland Park*, 215 Kan. 390, 399, 524 P.2d 1165 (1974), where we addressed an issue related to the construction of a median strip. We noted that "[t]he trial court instructed the jury 'that the landowner is not entitled to compensation for damages, if any, resulting from the regulation of traffic through prohibiting cross over between separate traffic lanes or construction of medial dividers' " and held:

"[L]imiting the landowners' ingress and egress to lanes for southbound travel when they formerly had direct access to both the northbound and southbound lanes of traffic, whether by a median strip, one-way street, or no left turn, is a valid exercise of police power and is not compensable." *Hales*, 248 Kan. at 185.

*Hales* is directly on point. It is sufficient authority for the trial court's ruling and our affirmance on appeal.

The more recent Court of Appeals' opinion of *Pringle* found *Hales* directly on point in affirming a trial court's finding that the City of Wichita's closing of a street and closure of a median were justified to achieve driver safety and was not a compensable taking. *Pringle*, 22 Kan. App. 2d at 302. The landowners' contention that access was lost and they were now required to travel "circuitous" and "tortious" routes was not found credible by either the trial court or the Court of Appeals, which held:

"An abutting owner has no right to the continuation of a flow of traffic in front of his property. Regulation of traffic under the police power without liability for compensation includes prohibiting left turns, prescribing one-way traffic, prohibiting access or crossovers between separated traffic lanes, prohibiting or regulating

parking, and restricting the speed, weight, size, and character of vehicles allowed on certain highways." 22 Kan. App. 2d 297, Syl. ¶ 3.

In the absence of our *Garrett* decision, what we said above in *Hales* and *Pringle* would be sufficient to affirm the trial court.

We did not intend by *Garrett* to place an unnecessary or additional burden on trial courts by requiring an entirely different or separate economic balancing test in traffic regulation and control cases where the test has previously been one of reasonableness. (*Garrett* is also discussed in *City of Wichita v. McDonald's Corp.*, 266 Kan. 708, 971 P.2d 1189 [1999].)

Any attempt to categorize or succinctly analyze our previous decisions is not without great difficulty, for each case is, to a large extent, fact driven. A crucial question has often been whether there is a denial of "a right of direct access" or the "regulation of traffic flow."

"Right of access" is defined as a landowner's right to reasonable, but not unlimited, access from the landowner's land to abutting public highways. *Brock v. State Highway Commission*, 195 Kan. 361, 370, 404 P.2d 394 (1965). Generally, the property owner is entitled to compensation when a city eliminates, takes away, or blocks a landowner's direct access to his or her property from abutting public roads or highways. See *McCall*, 215 Kan. 390, Syl. ¶ 4 (holding that an owner of property abutting a street or highway has a private right of access in such street or highway, which cannot be taken or materially interfered with without just compensation); *Kohn Enterprises, Inc. v. City of Overland Park*, 221 Kan. 230, 236-37, 559 P.2d 771 (1977) (following the holding in *McCall* and awarding compensation to the owner of property abutting an existing highway).

"Regulation of traffic flow," in contrast, is a limitation or restriction on the landowner's right of access to and from abutting public roads or highways. See *Brock*, 195 Kan. at 371. This court has recognized a city's right to regulate and restrict the use of public roads through its police power to the extent necessary to "provide for and promote the safety, peace, health, morals and general welfare of the people." *Small v. Kemp*, 240 Kan. 113, 119, 727 P.2d

904 (1986); accord *Smith v. State Highway Commission*, 185 Kan. 445, 453, 346 P.2d 259 (1959). Furthermore, we have held:

"A reasonable regulation imposed to protect the public is not a 'taking in the constitutional sense because the public use is paramount and public safety is the desideratum.'

. . . .

". . . The burden of proof is upon the one asserting unreasonableness. If it is determined that the regulation is unreasonable, it then becomes a taking and is compensable." *Hudson*, 246 Kan. at 403-04.

This court has found a city may regulate traffic by exercising its police power without compensation to abutting landowners by "prohibiting left turns, prescribing one-way traffic, prohibiting access or crossovers between separated traffic lanes, prohibiting or regulating parking, and restricting the speed, weight, size, and character of vehicles on certain highways. [Citations omitted.]" *Pringle*, 22 Kan. App. 2d at 301.

The ultimate basis for our decision in *Garrett* which gave rise to the discussion of an economic balancing was the fact that "the City not only limited Garrett's access to S.W. 21st Street, it failed to complete the ring road and in failing to do so diminished the commercial value of her property." *Garrett*, 259 Kan. at 915-16. We will not attempt to restate the complicated *Garrett* facts except to point out that Garrett had been assessed $144,733.51 for street construction and $33,948.93 for sewer construction for an improvement project required by a city resolution for an interior circle route which was not completed.

Our majority opinion in *Garrett* discussed three kinds of regulatory takings by use of police power: physical, title, and economic. The background of this discussion was the 1992 United States Supreme Court decision of *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992), and the analysis of *Lucas* in a law review article of a local government law symposium, Freilick & Garvin, *Takings After* Lucas: *Growth Management, Planning, and Regulatory Implementation Will Work Better Than Before*, 22 Stet. L. Rev. 409 (1993).

*Lucas* involved governmental regulation of the actual usage a landowner could make of his property. *Garrett* involved the appli-

cation of various resolutions of the City of Topeka for the usage of the Garrett property. These actions were ultimately determined to be an economic taking subject to the balancing test to determine if the regulation went too far, which a majority of the court held that it did. 259 Kan. at 917.

We limit the application of *Garrett* to its specific facts. The trial court was not required to apply *Garrett* in this case. The Eberths are not entitled to compensation for the State's exercise of its police powers in installing the median and minimally changing the Eberths' method of ingress and egress to and from their property.

The trial court is affirmed.