The Honorable Joann Flower State Representative, 47th District State Capitol, Room 426-S Topeka, Kansas 66612
Dear Representative Flower:
As State Representative for the 47th District you pose a number of questions concerning confined feeding facilities.
A confined feeding facility has been legislatively defined as "any lot, pen, pool or pond: (A) which is used for the confined feeding of animals or fowl for food, fur or pleasure purposes; (B) which is not normally used for raising crops; and (C) in which no vegetation intended for animal food is growing." K.S.A. 1997 Supp. 65-171d(b)(2). A water pollution control permit is required for any confined feeding facility with an animal unit capacity of 1,000 or more, and for any confined feeding facility with an animal unit capacity of less than 1,000 if the Secretary of Health and Environment determines that the facility has significant water pollution potential. K.S.A. 1997 Supp. 65-171d(c) and (f). If water pollution occurs or is threatened as a result of a confined feeding operation, the operator is required to construct a water pollution control facility in accordance with plans and specifications approved by the Secretary. K.A.R. 28-18-2. Water pollution control requirements differ for cattle, swine, sheep and other animals. K.A.R.28-18-3. In addition, any new construction or new expansion of a confined feeding facility is generally required to meet specified separation distances from any habitable structure. K.S.A. 1997 Supp.65-171d(h).
Two of your questions involve issues related to a possible moratorium on new confined feeding facility permits in relation to the Takings Clause of the Fifth Amendment to the United States Constitution. Before reaching these specific questions, we explore the territory of "takings" jurisprudence. We note as a prefatory matter that "temporary" takings, such as a moratorium on new water pollution control permits for confined feeding operations, are not considered any different in kind from permanent takings, for which the Constitution clearly requires compensation. First English Evangelical Lutheran Church of Glendale v.County of Los Angeles, California, 482 U.S. 304, 107 S.Ct. 2378,96 L.Ed.2d 250 (1987).
 "Takings" Jurisprudence
The Takings Clause of the Fifth Amendment to the United States Constitution provides, "[N]or shall private property be taken for public use, without just compensation." This restriction is applicable to the states through the Fourteenth Amendment. Chicago B. Q.R. Co. v.Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897). This case also gave rise to the over-arching maxim in takings jurisprudence that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking" which requires compensation by the government. How far is "too far" has been the topic of numerous court decisions which, unfortunately, are not always consistent in outcome or rationale. Lucas v. South Carolina Coastal Council, 505 U.S. 1003,112 S.Ct. 2886, 120 L.Ed.2d 798, 813, n. 7 (1992).
Two discrete categories of regulatory action have been recognized by the United States Supreme Court as per se compensable takings under theFifth Amendment "without case-specific inquiry into the public interest advanced in support of the restraint." Lucas, 120 L.Ed.2d at 812.
The Court has described the first per se category as "regulations that compel the property owner to suffer a physical `invasion' of his property" and stated, "In general (at least with regard to permanent invasions), no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation." Lucas,120 L.Ed.2d 812. This category of invasive regulatory taking has also been referred to as a "physical," "possessory" or "trepassory" taking which "arises when a regulation produces a physical intrusion, occupation, interference, or displacement onto or into a property owner's space sufficient to constitute a per se taking. " Garrett v. City of Topeka,259 Kan. 896, 907 (1996). A moratorium on water pollution control permits for new confined feeding facilities would not fall within this perse compensable category of invasive taking.
The second per se category identified by the Court in Lucas occurs "where regulation denies all economically beneficial or productive use of land." 120 L.Ed.2d at 813. This category embodies the concept of "negative regulation," that is, governmental restriction on the use of land for any economic use. "[W]hen the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a [compensable] taking." 120 L.Ed.2d at 815 (emphasis original). This category of regulatory taking has been referred to as a type of "economic" taking because it affects the value of the land.Garrett, supra.
The Court in Lucas, however, quickly recognized an exception to this "categorical" rule regarding economic takings and laid out a cognizable defense to such a claim for compensation. Finding that a "property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police power," the Court determined that a state was not required to compensate a property owner if the prohibited land use "inhere[s] in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." Lucas, 120 L.Ed.2d at 821. In other words, if the restriction does "no more than duplicate the result that could have been achieved in the courts — by adjacent land owners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise," a compensable taking is not effected.Lucas, 120 L.Ed.2d at 821.
If a governmental restriction bans all economically beneficial uses of land (and in the absence of the defense that the use prohibited is a background common-law nuisance or property principle), the taking is compensable. Under this analysis, however, the "complete evisceration of one single stick in the bundle of property rights," that is, of one economic use of property, does not effect a destruction of all economically beneficial uses. "The relevant denominator must be derived from the entire bundle of rights associated with the parcel of land."Clajon Production Corp. v. Petera, 70 F.3d 1566, 1577 (10th Cir. 1995). As the Supreme Court stated:
 "[A] claimant's parcel of property [can] not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable. To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of the parcel in question." Concrete Pipe and Products of California, Inc., v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539, 578
(1993), citing Penn Central Transportation Co. v. New York City, 438 U.S. 104, 130-131, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).
Absent evidence that the land would not have any other economically beneficial or productive use, it appears that a moratorium on water pollution control permits for new confined feeding facilities would not fall within this per se compensable category of economic taking. We hasten to add, however, that we have not been provided any facts upon which to make a definitive conclusion.
Remaining, then, are those potentially compensable situations which do require a "case-specific inquiry into the public interest advanced in support of the restraint." Lucas, 120 L.Ed.2d at 812. In circumstances where the governmental restriction is not a physical invasion and is less than a total prohibition of all economically viable uses, the owner will not be able to claim the benefit of the categorical formulation. FloridaRock Industries, Inc. v. U.S., 18 F.3d 1560 (Fed. Cir. 1994). However, as the Court in Lucas explicitly stated:
 "[T]he Fifth Amendment is violated when landuse regulation does not substantially advance legitimate state interests or denies an owner economically viable use of his land." 120 L.Ed.2d at 813 (emphasis added).
Garrett, supra, further explains that a partial economic taking is compensable if the economic impact on a landowner outweighs the public purpose of the regulation. However "the Takings Clause allows some property owners to be more burdened by a challenged regulation than others because `while each of us is burdened somewhat by restrictions, we, in turn, benefit greatly from the restrictions we place on others.'" Clajon,70 F.3d at 1579. But "where the use of police power is too unfair or goes too far, the public, not the landowner, must bear the cost."259 Kan. at 910. In relation to a partial taking, "too far" is when the regulation "does not substantially advance legitimate state interests."70 F.3d at 1576, citing Dolan v. City of Tigard, 512 U.S. 374,114 S.Ct. 2309, 2316, 129 L.Ed.2d 304 (1994). "The Supreme Court has declined to define precisely the nature of this analysis, explaining that it involves an `essentially ad hoc, factual inquiry.'" 70 F.3d at 1578.
 "Our cases have not elaborated on the standards for determining what constitutes a `legitimate state interest,' or what type of connection between the regulation and the state interest satisfies the requirement that the former `substantially advance' the latter. They have made clear, however, that a broad range of governmental purposes and regulations satisfy these requirements." Nollan v. California Coastal Commission, 483 U.S. 825 at 834-835, 107 S.Ct. 3141, 97 L.Ed.2d 677, 688 (1987).
However, the Supreme Court has stated that "the burden of striking down a generally applicable police power regulation on Takings Clause grounds `properly rests on the party challenging the regulation to prove that it constitutes an arbitrary regulation of property rights,'" Clajon,70 F.3d at 1578, or that it "utterly fails to further the end advanced as the justification for the prohibition." Nollan, 97 L.Ed.2d at 689.
Ultimately, the question that must be answered is whether, as a result of the denial of one economic use, there is a compensable taking of property by the government. The problem was phrased by one federal court:
 "Thus there remains in cases such as this the difficult task of resolving when a partial loss of economic use of the property has crossed the line from a noncompensable `mere diminution' to a compensable `partial taking.'
 "The trial court will find itself with little direct case law guidance. As Pennsylvania Coal and subsequent appellate court decisions have recognized, the question of when a regulatory taking occurs cannot be answered as a matter of absolute doctrine, but instead requires case by case adjudication: `the question depends upon the particular facts.' But recourse to the facts hardly solves the basic problem at hand — there simply is no bright line dividing compensable from non-compensable exercises of the Government's power when a regulatory imposition causes a partial loss to the property owner. What is necessary is a classic exercise of judicial balancing of competing values." Florida Rock, 18 F.3d at 1570
(citations omitted).
In analyzing whether a regulation substantially advances a legitimate state interest, the Supreme Court has identified three factors which should be taken into account in the required balancing of competing values:
 (1) The nature of the governmental action [Keystone Coal Association v. deBenedictis, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) earlier provided guidance regarding this factor by advising to assess whether the action was genuine, substantial, legitimate and designed to protect the public interest in health, the environment or the fiscal integrity of the area];
 (2) The severity of the economic impact on the affected property owner [although mere diminution in the value of property, however serious, is insufficient to demonstrate a taking];
 (3) The degree of interference with the affected property owner's reasonable investment-backed expectations [however, the Court commented that those who do business in a regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end. "Because legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations . . . even though the effect of the legislation is to impose a new duty or liability based on past acts" Concrete Pipe, 124 L.Ed.2d at 579].
As the Supreme Court emphasized in Keystone Coal, supra, "These `ad hoc, factual inquiries' must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances." Keystone Coal,94 L.Ed.2d at 494-495.
 Moratorium/Takings Questions
In relation to a moratorium on new confined feeding facility permits and the Takings Clause of the Fifth Amendment, you have posed two questions:
 1. If a hog facility has acquired land or has contracted with a farmer and is in the process of establishing a confined feeding facility prior to the effective time of the legislation, would the moratorium constitute a taking?
As discussed above, since this scenario does not appear to be a per se
categorical taking, the answer to this question would involve a "case-specific inquiry into the public interest advanced in support of the restraint," which would take into account the nature of the governmental action, the severity of the economic impact on the affected property owner (or lessee) and the degree of interference with the affected property owner's (or lessee's) reasonable investment-backed expectations. In the absence of any information regarding these specifics, we are unable to engage in any balancing of these competing interests.
 2. What proof would need to be shown by the government to enact a moratorium that could withstand a constitutional challenge?
Based on the principles discussed above, we can only provide general guidance. If challenged, the state would need to establish that a moratorium substantially advanced a legitimate state interest. Consequently, the state would need to establish that the nature of the governmental action, i.e. the moratorium, was genuine, substantial, legitimate and designed to protect the public interest in health, the environment or the fiscal integrity of the area. In addition, the state would need to establish that a moratorium did not cause an affected property owner (or lessee) to sustain a severe economic impact or severely interfere with a property owner's (or lessee's) reasonable investment-backed expectations.
 Equal Protection Issues
You have also asked the following questions concerning the constitutionality of a moratorium on new confined feeding facility permits under the Equal Protection Clause of the United States Constitution.
 1. Is it legal or constitutionally valid for the Legislature to enact legislation that regulates only one species of animals (i.e. hogs) and does not address other animals that may be located in a confined feeding facility?
 2. Is it a violation of the equal protection clause for the Legislature to enact legislation that regulates the establishment of lagoons as they pertain to only one species of animals (i.e. hogs) and does not address lagoon systems of other species such as cattle or humans?
 3. Would a moratorium on the permitting of new facilities with lagoons by KDHE also need to include a moratorium on the renewal or expansion of permits of facilities with lagoons to be constitutional? In other words, does a moratorium on the permitting of new facilities with lagoons and not on renewal or expansion permit applications pose constitutional questions under equal protection clause or other clauses of the constitution?
 4. Does a moratorium need to take into consideration the number of animals already in a community and the animals proximity to one another? For example, if there are a certain number of hogs already located in some counties, how can a moratorium be legally justified if it disallows hog farming in a county where there are no other hog facilities?
 5. Under what rational basis could a board of county commissioners establish a maximum number of animal units that would be allowed in a confined feeding facility? Would this limitation on the number of animal units need to be supported by scientific data to be legally defensible?
The Fourteenth Amendment to the United States Constitution provides, in relevant part, that "no State shall . . . deny to persons within its jurisdiction the equal protection of the laws." "Economic regulations —i.e., those burdening one's property rights — have traditionally been afforded only rational relation scrutiny under the Equal Protection Clause." Clajon, 70 F.3d at 1556, 1580. Additionally, "when social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes."City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432,105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). An economic regulation will be presumed constitutional unless it "rests on grounds wholly irrelevant to the achievement of the State's objective." Heller v. Doe, 509 U.S. 312,113 S.Ct. 2637, 2645, 125 L.Ed.2d 257 (1993). "Moreover, the state need not articulate its actual objective behind the scheme or submit evidence to support the rationality of the regulation, provided we [the court] can conceive of facts which reasonably justify the classification at issue."FCC v. Beach Communications, Inc., 508 U.S. 307, 113 S.Ct. 2096, 2101-03,124 L.Ed.2d 211 (1993). "The Equal Protection Clause is not meant to be a tool to second-guess legislative policies or to invalidate classification schemes simply because they `are not made with mathematical nicety or because in practice [they] result in some equality.'" Clajon,70 F.3d at 1581 quoting Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153,25 L.Ed.2d 491 (1970). Finally, the Kansas Supreme Court has recently held:
 "Equal protection of the law does not require the State to choose between attacking every aspect of public danger or not attacking any part of the danger at all. As we said in Manzanares v. Bell, 214 Kan. 589, 615 P.2d 1291 (1974): '[T]he legislative authority . . . is not bound to extend its regulations to all cases which it might possibly reach. The legislature `is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be the clearest.'" In the Matter of the Care and Treatment of Kenneth M. Hay, No. 74,112 (Jan. 30, 1998)
Based on this analysis, the answers to your equal protection questions are as follows:
1. The Legislature may enact legislation that regulates only one species of animals (i.e. hogs) and does not address other animals that may be located in a confined facility without violating the Equal Protection Clause as long as there is a rational basis for doing so.
2. The Legislature may enact legislation that regulates the establishment of lagoons as they pertain to only one species of animals (i.e. hogs) and does not address lagoon systems of other species such as cattle or humans without violating the Equal Protection Clause as long as there is a rational basis for doing so.
3. A moratorium on the permitting of new facilities with lagoons by KDHE does not also need to include a moratorium on the renewal or expansion of permits of facilities with lagoons to be constitutional under the Equal Protection Clause as long as there is a rational basis for the exclusion of renewal or expansion permits.
4. Equal protection considerations do not necessarily require a moratorium to take into consideration the number of animals already in a community and the animals proximity to one another.
5. Under equal protection considerations, a board of county commissioners may establish a maximum number of animal units allowed in a confined feeding facility using any basis which is rational, that is, relevant to the achievement of a legitimate county objective. [Please note that this response has not taken into account any other legal considerations which may be applicable, such as the authority of counties to regulate confined feeding facilities.]
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Camille Nohe Assistant Attorney General
CJS:JLM:CN:jm