The Honorable Stan Clark State Senator, 40th District State Capitol, Room 449-N Topeka, Kansas 66612-1504
Dear Senator Clark:
On behalf of the Solomon River Basin Advisory Committee, you ask several questions in regard to the water governance of groundwater management districts established pursuant to K.S.A. 82a-1020 et seq.
 I. IGUCA
Your first question is whether the Chief Engineer of the Division of Water Resources, Kansas Department of Agriculture, is precluded from establishing an intensive groundwater use control area (IGUCA) within the boundaries of an existing groundwater management district (GMD).
Your concern is prompted by the language in K.S.A. 82a-1036 that authorizes the Chief Engineer to establish an IGUCA within a GMD upon the recommendation of a GMD or submission of a petition signed by not less than 300 or by not less than 5% of the eligible voters of a GMD, whichever is less. Your question concerns the establishment of an IGUCAwithin the boundaries of a GMD where neither the GMD nor its eligible voters have requested that an IGUCA be established. You believe that the Legislature did not intend to preclude the Chief Engineer from establishing an IGUCA in a groundwater use area where conditions have been found to warrant regulation in the public interest. We agree.
At issue is whether the statutory language limits the Chief Engineer's authority inside the boundary of a GMD. In pertinent part, K.S.A. 82a-1036
states:
"Whenever a groundwater management district recommends the same or whenever a petition signed by not less than three hundred (300) or by not less than five percent (5%) of the eligible voters of a groundwater management district, whichever is less, is submitted to the chief engineer, the chief engineer shall initiate, as soon as practicable thereafter, proceedings for the designation of a specifically defined area within such district as an intensive groundwater use control area. The chief engineer upon his or her own investigation may initiate proceedings whenever said chief engineer has reason to believe that any one or more of the following conditions exist in a groundwater use area which is located outsidethe boundaries of an existing groundwater managementdistrict: (a) Groundwater levels in the area in question are declining or have declined excessively; or (b) the rate of withdrawal or groundwater within the area in question equals or exceeds the rate of recharge in such area; or (c) preventable waste of water is occurring or may occur within the area in question; (d) unreasonable deterioration of the quality of water is occurring or may occur within the area in question; (e) other conditions exist within the area in question which require regulation in the public interest."[1]
The statute specifically authorizes the Chief Engineer to initiate proceedings for establishing an IGUCA when such a recommendation is made by the GMD or its eligible voters. In areas outside of a GMD, the Chief Engineer must make certain findings (listed in the statute) before he can initiate the proceedings to establish an IGUCA.
The statute does not directly address the issue of whether the Chief Engineer, on his own initiative, may institute proceedings to establish an IGUCA within the boundaries of a GMD. We therefore must construe the provision using the rules of statutory construction. The fundamental rule of statutory construction, to which all other rules are subordinate, is that the intent of the Legislature governs where that intent can be ascertained from the statute.[2] When the language of a statute is susceptible to more than one interpretation, we may look "to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished and the effect the statute may have under the various constructions suggested."[3]
Legislative history does not indicate why the limiting language was added,[4] but does show that the language was not included in the original recommendation of the Interim Committee that drafted the bill, and that the statute's purpose is to require that the Chief Engineer address water depletion problems.[5] A construction of the provision that would limit the Chief Engineer's ability to establish an IGUCA inside the boundaries of a GMD on his own initiative contravenes this purpose and conflicts with other provisions in the Act as well.
Legislative intent is also to be determined from a general consideration of the entire Act, and in order to construe one part of a statute, it is permissible to look at other parts of it with a view of reconciling and bringing them into workable harmony and giving effect to the entire statute.[6] An IGUCA is an area in need of drastic conservation measures such as denying new permits and restricting those already allotted.[7] An interpretation of the GMD statute that contravenes the Chief Engineer's authority to issue water permits is specifically contrary to K.S.A. 82a-1039, which provides that "[n]othing in this act shall be construed as limiting or affecting any duty or power of the chief engineer granted pursuant to the Kansas water appropriation act."[8] Such an interpretation is also specifically contrary to K.S.A. 82a-1028 wherein the Legislature authorizes a GMD to take suitable action relating to conservation and management of a GMD so long as the action is not inconsistent with the provisions of the Water Appropriation Act,[9] and K.S.A. 2001 Supp. 82a-1038:
"In any case where the chief engineer finds that any one or more of the circumstances set forth in K.S.A. 82a-1036
and amendments thereto exist and that the public interest requires that any one or more corrective controls be adopted, the chief engineer shall designate, by order, the area in question, or any part thereof, as an intensive groundwater use control area.
K.S.A. 2001 Supp. 82a-1038, which provides how the Chief Engineer establishes an IGUCA clearly requires that in any case (presumably in or out of a GMD) the Chief Engineer must make the findings listed in the statute in question. It is clear that the mandate found in K.S.A. 82a-1036
that the Chief Engineer "shall initiate, as soon as practicable thereafter, proceedings for the designation of a specifically defined area within such district as an intensive groundwater use control area" does not mean that an IGUCA will be established but rather that the Chief Engineer will make findings that certain conditions exist as set forth in K.S.A. 82a-1036. The conditions that he must find are listed in K.S.A.82a-1036 in reference to an area outside the boundaries of a GMD but K.S.A. Supp. 82a-1038 makes clear that the Chief Engineer must find these conditions to exist before he establishes an IGUCA in or out of the boundaries of a GMD. These provisions in the GMD statutes indicate that the Legislature did not intend that the Chief Engineer's authority be usurped by a GMD, and consequently we need to construe the language in question so that it harmonizes and makes sense within the context of its legislative scheme.
Accordingly, it is our opinion that the Legislature did not intend that a GMD be able to preclude or prevent the Chief Engineer from establishing an IGUCA within a GMD. In our judgment, K.S.A. 82a-1036 authorizes the Chief Engineer to address water depletion problems and lists conditions that may warrant his attention.
 II. One Person, One Vote
Your second question is whether the definition of "eligible voter" found in K.S.A. 82a-1021 complies with the constitutional doctrine of "one person, one vote." Generally, the right to vote in an election is protected by the United States Constitution against any restrictions, other than residence, age, and citizenship. Commonly known as the doctrine of "one person-one vote," and founded upon equal representation, it applies to local units of government through the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.[10]
Only certain land owners and water users are eligible to vote in a GMD election.[11] The statute defines an eligible voter as a landowner who owns, of record, any land or any interest in land, comprising forty (40) or more contiguous acres located within the boundaries of the district.[12] Also eligible to vote is a water user if he or she withdraws or uses groundwater from within the boundaries of the district in an amount of one acre-foot or more per year. The voting restrictions apply to any public or private corporation; for example, a municipality withdrawing groundwater in an amount of one acre-foot or more per year qualifies as a single eligible voter within the definition of a water user.[13] At issue is whether the definition of an eligible voter is constitutional given that the statutory definition of an eligible voter does not comport with one person, one vote.
The United States Supreme Court has fashioned a narrow exception to the one person, one vote rule that involves units of government having a narrow and limited purpose that disproportionately affects the few who are entitled to vote. In Ball v. James,[14] a water district exercised specific functions generating and selling electricity in order to meet revenue needs but did not enact laws governing the conduct of citizens, nor did it administer normal governmental functions such as the maintenance of streets, the operation of schools, sanitation, health or welfare services. Similarly, in Sayler Land Co. v. Tulare Lake BasinWater Storage District,[15] the Court's focus was the water district's limited authority and narrow purpose of acquisition, storage and distribution of water for farming. In both of these cases the actions of the water district disproportionately affected those eligible to vote. The narrow exception was rejected by the Tenth Circuit Court of Appeals[16] when applied to how the Kansas State Board of Agriculture was elected. The Court found that the state agency's powers affected all citizens of the State, comprised part of normal state government and thus did not give rise to the Ball and Sayler exception.[17]
A GMD exercises narrow powers focused on the conservation of water drainage, recharge, storage, and distribution,[18] and in our opinion, its narrow focus gives rise to the application of the Ball and Sayler
exception. If the exception applies to the restriction, the standard to be met in order to survive a constitutional attack changes from that of having to show a compelling state interest to that of having to show that the restriction on the right to vote is rationally related to the purpose for which it was enacted. The relationship is evident from the GMD statutes. The statutes governing a GMD, K.S.A. 82a-1020 et seq., encourage participation only by those water users having vested rights to appropriate groundwater. The statutes allow a landowner who is not a water user to exclude his or her land from district assessments, with attendant loss of voting privileges, and grant voting privileges to water users with vested rights to appropriate groundwater, whether or not they are landowners. Thus, restricting the franchise to those disproportionately affected by the actions of the GMD is rationally related to the purpose for which the GMD was created, namely the conservation of water by those who use it. Accordingly, it is our opinion that the definition of an eligible voter found in K.S.A. 82a-1021 does not violate the equal protection clause of the United States Constitution because the voting restriction involves a unit of government that is excepted from the one man, one vote rule by case law.
 III. Takings Analysis
Your third question is whether the reduction of a previous water appropriation right constitutes a compensable taking. Your question does not provide us any indication of the circumstances under which the State is taking the action to reduce. The circumstances are important because there is a difference between a taking of property for public use, which generally requires compensation, and a taking under the exercise of a state's police power to protect the public health, safety, welfare or morals, which does not require compensation.[19] Given that the nature of the State's action is critical in a takings analysis, we can answer your question only by providing an overview of the legal analysis.
Generally, the Takings Clause of the Fifth Amendment[20] to the United States Constitution prohibits the government from taking private property for public use without just compensation and is made applicable to the states through the Fourteenth Amendment.[21] The United States Supreme Court has recognized several categories of state regulatory action that are compensable without making inquiry into the public interest that is advanced by the state in support of the restraint. The first is the category of state action that results in physical invasion of property and the second, title regulatory taking where the state action "goes too far" and decimates the economic value of the land by restricting all of the property's productive use.[22] In between these categories is economic regulatory action taken by the state that amounts to an acquisition of property for public use and requires that the competing values be weighed in order to determine whether the regulation advances a legitimate state interest, i.e. where both the purpose of the regulation and the economic impact are considered to determine whether the restriction on the property is reasonable.[23] This category requires a case by case adjudication of the attendant facts because there is no absolute line between compensable and non-compensable exercises of the government's power.[24]
In regard to your specific question, it is clear that a reduction in a water right does not amount to a physical taking or a taking where all beneficial use is taken, and thus, if anything, must fall in the category where a balancing test is appropriate. No balance can be made without consideration of the purpose for which the reduction has been made. In a report dealing with the constitutional implications of conservation plans,[25] Professor Peck uses an example that illustrates the complex nature of the constitutional analysis in this area. His example is a water right reduction that results from a conservation plan where we must determine whether the water right is being affected to promote health, safety and welfare,[26] and if so, there is no compensable taking when a water right is reduced. However, if the conservation plan is implemented to allow for future public use, then reducing the existing water right may require compensation.
In sum, we have attempted to show that there is no formula for deciding whether the impact of an regulatory taking should be borne by the individual or by the public as a whole, but there are factors that have been identified and applied. These factors include the character of the governmental action, the economic impact of the governmental action, and the action's interference with reasonable investment-backed expectations.[27]
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Guen Easley Assistant Attorney General
CJS:JLM:GE:jm
[1] Emphasis added.
[2] In Re Adoption of J.H.G., 254 Kan. 780, 790 (1994).
[3] Brown v. Unified School Dist. No. 333, 261 Kan. 134, 142 (1996), citing State v. Gonzales, 255 Kan. 243, 249, (1994) (quoting Brown v.Keill, 224 Kan. 195, Syl. ¶ 3, (1978)).
[4] Minutes, Senate Committee on Energy and Natural Resources, March 8, 1978, addressing 1978 HB No. 2702.
[5] Interim Report of the Governor's Task Force on Water Resources, December, 1977, (it appears the concern was that the Chief Engineer was not acting to address Ogalla depletion problems).
[6] Todd v. Kelly, 251 Kan. 512, 516 (1992), quoting In re Marriage ofRoss, 245 Kan. 591, 594 (1989); Guardian Title Co. v. Bell, 248 Kan. 146,151(1991), citing State v. Adee, 241 Kan. 825, 829 (1987).
[7] K.S.A. 2001 Supp. 82a-1038 authorizes suitable action provided it is not inconsistent with Article 7 in Chapter 82a, the Kansas Water Appropriation Act. See Attorney General Opinion No. 93-15 (an IGUCA is unlike a general conservation plan established pursuant to K.S.A.82a-733).
[8] K.S.A. 82a-1039, enacted in 1978, has never been amended by the Legislature.
[9] Found in Article 7, Chapter 82a.
[10] Avery v. Midland County, Texas, 390 U.S. 474, 88 S.Ct. 1114,20 L.Ed.2d 45 (1968); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362,12 L.Ed.2d 506 (1964).
[11] K.S.A. 82a-1021(e).
[12] Ibid.
[13] K.S.A. 82a-1021(k).
[14] 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981).
[15] 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973).
[16] Helebust v. Brownback, 42 F.3d 1331 (10th Cir. 1994).
[17] Id. at 1334-35.
[18] K.S.A. 82a-1028.
[19] Mugler v. Kansas, 123 U.S. 623, 669, 31 L.Ed. 205 (1887);Small v. Kemp, 240 Kan. 113, Syl. ¶ 2 (1986).
[20] The Fifth Amendment provides "nor shall private property be taken for public use, without just compensation."
[21] Lone Star Industries, Inc. v. Secretary, Kansas Dept. ofTransportation, 234 Kan. 121, 123, (1983); Chicago B. Q.R. Co. v.Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897); codified at K.S.A. 26-513.
[22] Penn Central Transportation Co. v. New York City, 438 U.S. 104,98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); see Lucas v. South Carolina CoastalCouncil, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (nuisance law defense to third Penn Central criteria); but see Palm Beach IslesAssociates v. U.S., 231 F.3d 1354, 1363 (Fed. Cir. 2000) (in a regulatory taking, properly determined to be "categorical," the property owner is entitled to a recovery without regard to consideration of investment-backed expectations); Garrett v. City of Topeka, 259 Kan. 896
(1996).
[23] Garrett, 259 Kan. 896 (1996).
[24] Ibid. at 910; Dolan v. City of Tigard, 512 U.S. 374; 114 S.Ct. 2309,129 L.Ed.2d 304 (1994); Florida Rock Industries, Inc. v. U.S., 18 F.3d 1560
(Fed. Cir. 1994); Clajon Production Corp. v. Petera, 70 F.3d 1566,1579 (10th Cir. 1995); Tahoe-Sierra Preservation Council, Inc. v. TahoeRegional Planning Agency, 535 U.S. ___ (2002).
[25] Peck, J., Legal Constraints on the State of Kansas in ImposingConservation Practices on Holders of Existing Water Rights, Kansas Water Resources Research Institute, Contribution No. 254 (1986).
[26] See F. Authur Stone Sons v. Gibson, 230 Kan. 224 (1981) (permit procedures for appropriation of water do not constitute a taking of private property without due process or compensation because they fall within the reasonable exercise of the state's police power to control water use in the state).
[27] Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309,129 L.Ed.2d 304 (1994); Keystone Coal Association v. deBenedictis,480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); Tahoe-SierraPreservation Council, Inc., supra, note 24.